**Xenia GREEN, Petitioner,**

v.

**Robert ABRAMS, Attorney General of the State of New York, New York County District Attorney and Commissioner of Corrections, County of New York, Respondents.**

**No. 92 Civ. 3819 (RWS).**

United States District Court, S.D. New York.

July 8, 1992.

Eleanor Jackson Piel, New York City, for petitioner.

Robert M. Morgenthau, Dist. Atty., New York County, New York City (Morrie I. Kleinbart, Asst. Dist. Atty., of counsel), for respondents.

## OPINION

SWEET, District Judge.

Petitioner Xenia Green ("Green") has applied for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a). For the reasons set forth below, her petition is denied.

*Background*

Green operated an establishment at 104 East 40th Street (the "Premises") where for a $50 to $100 fee she would administer or aid in administering colonics using a device invented by her. The device essentially consisted of two hoses connected to a speculum. One hose was also connected to a sink faucet and the other drained into a sink. The speculum was inserted into a client's rectum and regulated the directional flow of water, but not its pressure. Once the device was in place and the faucet turned on, a client would essentially control the flow of the water by crimping and uncrimping the drain hose. Green instructed her clients to release the drain hose when they felt pain or pressure. The Premises' faucets were capable of delivering water at a pressure of 40 to 50 pounds per square inch.

At about 4:00 a.m. on March 1, 1986, police officers were summoned to the Premises by someone reporting that a man there had stopped breathing. When they arrived, the officers found a dead sixty-year old man. An autopsy performed on the decedent revealed that his cecum had ruptured several hours before his death, presumably while receiving a colonic. About eight liters of waste water had flowed through the rupture and flooded his abdominal cavity, resulting in a massive

infection that caused his death. Death was estimated to have occurred between 12:00 midnight and 2:00 a.m.

The decedent was a regular customer of Green's establishment. At approximately 9:00 p.m. the evening before he died, he gave himself a colonic while on the Premises. Between then and when he was found by the police, he did not leave the Premises. Green claims the decedent gave himself a second colonic at 3:00 a.m.

Green was arrested and eventually charged with one count of second degree manslaughter, N.Y. Penal Law § 125.15, and one count of criminally negligent homicide, *Id.* § 125.10. She was tried before a jury in December 1987, and found not guilty of manslaughter, but guilty of criminally negligent homicide.

At trial, the State's theory appears to have been that Green was aware of the risks involved in colonics; that, in light of these risks, her device was unreasonably dangerous and such an injury was foreseeable; and that she failed to summon medical help once someone was injured. In support of this theory, the State introduced a number of items seized from the Premises into evidence, including a pamphlet co-authored by Green acknowledging the possible dangers of colonics, the device invented by Green, a medical diploma for a Dr. Stim, a medical encyclopedia, patient files, appointment books, and other literature describing various methods of administering colonics.

Expert testimony at Green's trial showed that her device was inherently dangerous and that, as a practitioner, Green should have been aware of its dangers. Primarily because of the danger of rupture, most colonic devices introduce water in comparatively small, controlled quantities at a low pressure. Repeated colonics, as well as age, tend to weaken and desensitize a person's colon, increasing the risk of rupture.

Green showed that, before the night in question, she had administered over 3,300 colonics without incident. One of the detectives investigating the case also testified that Green had told him that the decedent usually would administer his colonic himself and that Green's only role would be to hook the intake hose to the faucet. He usually would undergo a daily colonic for three straight days at the beginning of each month.

On March 3, 1988, Green was sentenced to five years probation and a $5,000 fine. As a condition of her probation, Green could not administer colonics. Green was not told by when the fine had to be paid. *See* Trans. 37–38. That day, Green was also presented with a form specifying the conditions of her probation, which she signed. The form set forth the above sentence and the terms of her probation, but also failed to state a date by which the $5,000 fine and a $100 mandatory surcharge had to be paid.

Green appealed her conviction to the Appellate Division. That court allowed Green to proceed *in forma pauperis.*

On May 16, 1991, Green appeared before the sentencing judge for allegedly having violated her parole. At the hearing, her counsel stipulated that she had not paid the fine nor the surcharge. Her Probation Officer testified that she knew of the fine and her obligation to pay it. The Probation Officer also stated that Green was continuously unemployed and was living on the generosity of her friends and on what she made by selling jewelry on the street. During the examination of the Probation Officer, the sentencing court asked her whether she knew if Green had ever received gifts for "spiritual counseling". The Probation Officer answered "No". Trans. 10 (May 16, 1991).

It was also established at the hearing that Green told the Probation Officer she would not pay the fine until she had paid her lawyer and that Green had never provided the Probation Office with any financial statements or other documentation showing she was indigent. Furthermore, Green submitted an affidavit stating that she had been living at 108 East 38th Street since her conviction. Green had always told her Probation Officer that she lived at another address.

Placing the burden of proof on Green, the sentencing court found that she had failed to show that she could not, in good faith, pay the fine. In doing so, it took notice of the fact that Green appeared to live in a high income area. Instead of revoking her sentence at that point, though, the court put her sentence over to receive more information. *See id.* at 24.

At the next hearing, on June 21, 1991, Green offered to pay $300 then and $100 a month thereafter until the $5,100 was paid. She also stated that her attorney, but not the attorney representing her at the hearing, had told her that she did not have to pay the fine until her appeal was over and her probation period had expired.

The court found Green's payment offer "totally unacceptable". Trans. 9 (June 21, 1991). It instead found that Green had not been forthright with the Probation Office and the court, that she was living in a high income neighborhood, and that she had been soliciting funds by offering religious assistance to others. Overall, it found her refusal to pay the fine "simply a willful refusal to be governed by the mandate of the court," *id.* at 9, and resentenced her to one year in prison.

Execution of the sentence was stayed for thirty days to allow Green time to appeal. She then filed another appeal to the Appellate Division, which was consolidated with her still pending trial appeal. The Appellate Division further stayed the execution of her sentence.

On appeal, Green argued that the evidence presented at trial did not prove she caused the decedent's death or acted with criminal negligence, that she was entitled to a jury instruction on circumstantial evidence, and that the revocation of her probation violated due process. On May 19, 1992, the Appellate Division unanimously affirmed her conviction and the revocation of her probation. 180 A.D.2d 141, 584 N.Y.S.2d 543. Leave to appeal to the Court of Appeals was denied on May 27, 1992.

On May 27, Green filed the instant habeas petition. She also brought an order to show cause seeking to release her from the expected execution of the sentence and temporarily staying the execution of her sentence pending the outcome of this action. Her request for temporary relief was denied, and the matter was set down for a hearing on June 3, 1992.

On May 28, Green again appeared before the sentencing court. A week earlier, she had offered to pay the $5,100 in its entirety with funds raised from friends. On the basis of this offer, Green requested that she be resentenced. Her request was denied, and the sentence executed.

Oral argument on the papers submitted by Green and the State was heard on June 3. Since then, both parties have submitted a number of other documents, the latest of which was received on June 24, 1992.

*Discussion*

Green argues that she is entitled to the relief requested for two reasons. First, she contends the State failed to prove beyond a reasonable doubt that she was negligent in her actions and caused the decedent's death. Second, she contends the revocation of her sentence violated due process.[1]

I. The Sufficiency of the Evidence

■ Green's argument directed at the weight of the evidence against her can invoke only due process concerns, as her petition may not be granted unless she shows she is "in custody in violation of the Constitution or laws or treaties of the United States". 28 U.S.C. § 2254(a); *see Wright v. West,* —— U.S. ——, ——, 112 S.Ct. 2482, 2486, 120 L.Ed.2d 225 (1992) (plurality opinion); *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). The record is reviewed deferentially. This inquiry "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the rel-

---

1. In her papers, Green also argues that the sentencing court should have accepted her offer of payment on May 28, 1992. This argument has been withdrawn as unexhausted. *See* Letter of Eleanor Jackson Piel (June 5, 1992).

evant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318–19, 99 S.Ct. at 2789 (emphasis in original, citations omitted); *see also West*, — U.S. at —, 112 S.Ct. at 2486 (plurality opinion). Therefore, every inference that can be drawn from the evidence, whether direct or circumstantial, must be drawn in the State's favor. *See Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir.1988), *cert. denied*, 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 334 (1989).

■ New York's criminally negligent homicide statute provides that "[a] person is guilty of criminally negligent homicide when, with criminal negligence, [s]he causes the death of another person." N.Y.Penal Law § 125.10. A person acts with criminal negligence:

> with respect to a result ... when [s]he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

*Id.* § 15.05[4].

Under this standard, there was sufficient evidence presented from which the jury could infer that Green was criminally negligent in causing the decedent's death. Materials within Green's possession and an article co-authored by her detailed the dangers of colonics. Most advocated using small, controlled amounts of liquid administered at very low pressures to avoid the risk of rupture. The device Green invented, on the other hand, did not control the volume or pressure of the water delivered. At the Premises, water pressure could reach upwards of 50 pounds per square inch, about 100 times greater than that recommended by a colonic therapist who testified for the State. The jury could therefore infer that Green had created a substantial and unjustifiable risk of rup-

ture that constituted a gross deviation from the standard of care she should have employed.

As for causation, sufficient evidence also existed from which the jury could conclude that Green's device caused the injury and that she waited an unreasonably long time before calling for help. The Medical Examiner's testimony established that the decedent suffered a ruptured cecum, causing roughly eight liters of fluid to enter his abdominal cavity. Given the testimony concerning the safety of the device, such an occurrence was foreseeable, and the jury was entitled to conclude that Green was criminally negligent in providing the means for it to have happened. *See United States v. Guillette*, 547 F.2d 743, 749 (2d Cir.1976), *cert. denied*, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977).

The Medical Examiner also estimated that the time of death was at least two hours before Green called 911, if not more, and that the rupture more than likely occurred much earlier. Indeed, the testimony of another customer suggests the decedent was injured as early as 9:00 p.m. the night before. The jury could have further assumed that some sort of mess would have been created by the decedent, yet, when the police arrived, the Premises were "spotless". The jury thus could have concluded that Green realized that something had happened to the decedent, but failed to aid him.

Because there is sufficient evidence within the record from which *any* trier of fact could have found Green guilty of criminally negligent homicide, her petition for habeas relief on this ground is denied. *See Reddy*, 846 F.2d at 869.

## II. The Revocation of Green's Parole

Green also contends that the State revoked her parole in violation of due process.

■ A probationer enjoys a liberty interest protected by due process. The Supreme Court has therefore placed limitations on a state's ability to revoke probation. *See Black v. Romano*, 471 U.S. 606,

610, 105 S.Ct. 2254, 2257, 85 L.Ed.2d 636 (1985); *United States v. Brown*, 899 F.2d 189, 193 (2d Cir.1990). "Foremost among these is the right to a hearing at which the court determines two issues: whether the probationer violated a condition of probation as a matter of fact and, if so, whether this fact warrants revocation." *Brown*, 899 F.2d at 193. The probationer also is entitled to written notice of the alleged violation, disclosure of the State's evidence, an opportunity to be heard and present evidence, a neutral hearing body, and a statement of the facts and reasons for revoking probation. *Black*, 471 U.S. at 612, 105 S.Ct. at 2258; *Brown*, 899 F.2d at 193 n. 2. If a probationer is unable to pay a fine despite bona fide attempts to do so, the State may not revoke probation and impose a term of imprisonment. *Bearden v. Georgia*, 461 U.S. 660, 672, 103 S.Ct. 2064, 2073, 76 L.Ed.2d 221 (1983).

■ The sentencing court held two hearings concerning Green's alleged probation violation. She was represented by counsel and allowed to present evidence. The court stated its reasons for revoking the probation on the record. Green's counsel and the State both appeared to understand what the alleged violation was and stipulated that the fine had not been paid. The sentencing court therefore afforded Green with sufficient procedural due process protection.

■ Substantively, Green attacks the revocation on two grounds. First, she argues that because the sentencing court never specified a date by which the fine was to be paid in its original order, it was error to revoke her probation for failure to pay the fine before the end of her probationary period. Second, she asserts that the sentencing court revoked her probation in violation of *Bearden v. Georgia.*

Green's first argument ignores the following acknowledgment that appears on the form setting forth the conditions of her probation immediately above her signature:

> I understand that the Court may, at any time prior to the expiration or termination of the period of Probation, modify or enlarge the conditions or, if I commit an additional offense, other than a traffic

infraction, or violate a condition, revoke the sentence of Probation.

The form also plainly states that paying the fine was a condition of probation. *Compare United States v. Grant*, 816 F.2d 440, 441 (9th Cir.1987). Nevertheless, Green waited over two and a half years before offering to pay $10 towards the $5100 owed. *See* Trans. 8 (May 16, 1991). Green was on notice that paying the fine was a condition of her probation. Her minimal effort at complying provided the sentencing court with a basis for determining whether she was in compliance with that condition.

■ Before revoking a term of probation for failure to pay a fine, *Bearden* requires a court to inquire into the reasons for the probationer's failure. If the probationer has willfully refused to pay or failed to make a bona fide effort to acquire the necessary resources, a court may revoke the probation and sentence the probationer to prison. 461 U.S. at 672, 103 S.Ct. at 2073.

■ At the first hearing, the court decided:

> that the probationer has violated her terms of probation by the failure to make any bona fide efforts to acquire the financial resources necessary to pay the fine that's been imposed.
>
> It's also clear that the defendant was not candid with her probation officer. She misstated her residence for one thing, and under oath or affidavit I assume that she understates that an affirmation is an oath, that she lived since the time of her conviction, at 108 East 38th Street, and I think that the Court can take note that 108 East 38th Street is not a welfare hotel, and that is a place where a person do [sic] not reside who are [sic] without means or someone who's supplying means to them.
>
> It's clear that this defendant has taken a position an arbitrary position that she's simply not going to pay the fine.

Trans. 23–24 (May 16, 1991).

At the second hearing, the court further stated to Green that she had:

> totally ignored the court's mandate to pay the fine which was part of your

sentence. I find that your refusal to pay, failure to pay was not based on inability, but it's simply a willful refusal to be governed by the mandate of the court. Testimony at the hearing in violation of probation disclosed that you had not been forthright with the Probation Department and you were not with the court. You submitted an affidavit which was contrary totally to the information you had supplied to the court—to the Probation Department.

You have indicated you're living at one location and—which is not a housing development. It's a high income residential area in which you are presently residing. That you're also soliciting funds because of some religious assistance that you are alleged to be giving to other people. You now come here after March '88 offering three hundred dollars and suggesting that your attorney told you not to pay the money. And three years later you come here with three hundred dollars toward the five thousand dollars with an offer of a hundred dollars a month. That's totally unacceptable. I refuse to accept that.

I refuse to accept, and reject as somewhat stupid the update by the Probation Department. Perhaps the probation report that's reflected here and the testimony that was given in this courtroom indicates why probationers have difficulty surviving on probation when people are being supervised in that way.

Trans. 8 (June 21, 1991).

Green had proceeded *in forma pauperis* on her appeal. Presumably, the Appellate Division found that Green indeed was indigent during the relevant period at issue, and this finding could have constituted some evidence of Green's inability to pay the fine at the revocation hearing.

The Probation Officer testified that she constantly reminded Green of her obligation to pay the fine. Green did make some money by selling jewelry on the street, but what profit she made from this venture, if any, was not presented. Although the record here does not indicate the basis, the sentencing court also appeared to have evidence before it showing that Green had received "gifts" for performing spiritual counseling and that she was living on the generosity of friends. Again, to what extent, if any, such funds allowed Green to live beyond a state of indigency was not on the record.

Green had submitted an affidavit at the hearing conceding that she lived at 108 East 38th Street, an address which the court noted was in a high income neighborhood. Green had never apprised the Probation Office of this address, but had consistently listed an address on Water Street instead. On a number of occasions, Green also told the Probation Officer she would not pay the fine until after she had paid her attorney. Moreover, Green submitted no evidence to support her claim of indigency.

At the first sentencing hearing, the court placed the burden of proving indigency on Green, over her counsel's objection. The court then found that Green had wilfully violated her probation and had made no bona fide efforts to attempt to pay the fine. Placing the burden of proving her indigency on Green once it was established that a probation condition had been violated did not violate due process. *Cf. Martin v. Ohio*, 480 U.S. 228, 235–36, 107 S.Ct. 1098, 1103 (1987); *Patterson v. New York*, 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977). This Court will therefore defer to the sentencing court's findings of "historical" facts. 28 U.S.C. § 2254(d); *see, e.g., Matusiak v. Kelly*, 786 F.2d 536, 543 (2d Cir.), *cert. dismissed*, 479 U.S. 805, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986).

In light of the record before it, the sentencing court was entitled to conclude that Green failed to make a bona fide effort to pay the fine. Her petition for relief is therefore denied. *Bearden*, 461 U.S. at 672, 103 S.Ct. at 2073.

*Conclusion*

For the reasons set forth above, Green's petition for a writ of habeas corpus is denied.

It is so ordered.