984 F.2d 41
 Xenia GREEN, Petitioner-Appellant,
v.
Robert ABRAMS, Attorney General of the State of New York,
N.Y. County District Attorney's Office,
Commissioner of Corrections, County of
New York, Respondents-Appellees.
 No. 610, Docket 92-2553.
 United States Court of Appeals, Second Circuit.
 Argued Oct. 30, 1992.
Decided Jan. 12, 1993.
 
 Eleanor Jackson Piel, New York City, for petitioner-appellant.
 Mitchell G. Krapes, Asst. Dist. Atty., New York County (Robert M. Morgenthau, Dist. Atty. for New York County, Alan Gadlin, Asst. Dist. Atty., New York County, New York City, of counsel), for respondents-appellees.
 Before: MESKILL, Chief Judge, WINTER, Circuit Judge, and RESTANI, Judge*.
 RESTANI, Judge:
 Xenia Green was convicted of criminally negligent homicide on December 16, 1987. After exhausting her remedies in the New York state court system,[1] Green petitioned for a writ of habeas corpus from the United States District Court for the Southern District of New York. The district court, Sweet, J., denied Green's petition, but certified the issue for appeal.[2] We affirm the district court's denial of a writ of habeas corpus and we decline to appoint counsel for petitioner.
 
 
 1
 On March 1, 1986, a sixty-year old man was found dead at the Salon Colonique, a business establishment owned and operated by petitioner, Xenia (also known as "Sophie" or "Sophia") Green. The Salon Colonique offered a form of colonic wash to its customers, using a device invented by Green. The device consisted of a metal speculum, an inflow tube connected to a water faucet, and an outflow tube. To operate the device, Green or the customer would insert the speculum, attach the tubes and turn on the water faucet.
 
 
 2
 The pressure in the faucets at the Salon Colonique was between 40 and 50 pounds per square inch. Green encouraged her customers to crimp the outflow tube in order to increase the pressure and thus supposedly the effectiveness of the device. Most procedures of this type deliver water into the colon at a rate of less than one pound per square inch. The government's expert testified that Green's variation from the normal procedure was dangerous and without medical justification.
 
 
 3
 An article co-authored by Green acknowledged the danger of high pressure colonics which "force water into the colon." Xenia Green & Dan Firth, Welcoming the Water Angel: An Introduction to Colonics 8-9. The same article claimed that Green's establishment administered a safe treatment to its customers because the water tank on the roof of the building, which fed the faucets, acted exactly like a water bag used in a traditional enema. It never mentioned the fact that the pressure in the faucets exceeded the pressure from a water bag by more than forty times. See id.
 
 
 4
 The decedent often visited Green's establishment. Green testified that on the night of his death, the decedent administered an enema to himself at 9:00 p.m. on February 28 and a second enema at 2:30 or 3:00 a.m. the morning of March 1. At 4:00 a.m. on March 1, Green called 911 to report that her client had stopped breathing. When the police arrived, Green's client was found dead, naked and seated on the commode. Both the body and the rooms were spotless.
 
 
 5
 An autopsy determined that death occurred between 11:30 p.m. on February 28 and 3:30 a.m. on March 1 from a rupture of the colon. The examining doctor discovered a half-inch tear in the wall of the cecum, the upper portion of the colon. The intestinal cavity was filled with water and waste material which had leaked through the wall of the colon. Death resulted from infection and inflammation of the abdominal organs. The examining doctor concluded that the pressure from Green's device caused the rupture of decedent's colon, already weakened by age and previous enemas.
 
 
 6
 According to the autopsy report, the rupture occurred between two and six hours before death. Although an expert in the field testified that hydrocolon therapists should constantly attend to the client during the colonic, Green was not with her client during the procedure or at the time of death. A perforated cecum is not immediately fatal and, if detected in time, need not result in death.[3]
 
 
 7
 Based on the evidence recited above, on December 16, 1987 a New York state jury found Green guilty of criminally negligent homicide. Three months later, on March 3, 1988, she was sentenced to five years probation and fined $5,000.00. Neither the oral statements of the sentencing judge nor his written order specified a date for payment of the fine. During the probation period, Green made one attempt to pay $10.
 
 
 8
 The Department of Probation moved to revoke Green's probation on the ground that she had not made a good faith attempt to obtain resources to pay the fine. A hearing was held at which the state court judge found that Green had failed to make "any bonafide [sic] efforts to acquire the financial resources necessary to pay the fine that's been imposed." He therefore found that she had violated the conditions of her probation and revoked her sentence.
 
 
 9
 Subsequently, a resentencing hearing was held on June 21, 1991, and the state court resentenced Green to a one-year prison term for failing to make good faith efforts to pay the fine. The court rejected Green's offer, made during the resentencing hearing, to pay a lump sum of $300 immediately and $100 per month in the future. After the state appellate court affirmed her resentencing, petitioner offered to pay the entire fine out of funds provided by her friends, but the trial court refused. On May 27, 1992, Green petitioned for a writ of habeas corpus. The United States District Court for the Southern District of New York denied her petition in an opinion issued on July 8, 1992. This appeal followed.
 
 STANDARD OF REVIEW
 
 10
 A writ of habeas corpus may be granted to a person being held "in custody in violation of the Constitution or laws ... of the United States." 28 U.S.C. § 2241(c)(3) (1988). The Supreme Court has determined that the due process clause of the Fourteenth Amendment is violated when a person is convicted without "sufficient proof." Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). There is sufficient proof of guilt if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319, 99 S.Ct. at 2789.[4]
 
 DISCUSSION
 
 11
 Green relies primarily on two arguments: 1) that there was insufficient evidence to convict her under New York state law, and 2) that revoking her probation for failure to pay the fine violated her due process rights.
 
 A. Sufficiency of the Evidence
 
 12
 In considering a petition for writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime. Jackson v. Virginia, 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16. New York state law provides: "[a] person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person." N.Y. Penal Law § 125.10 (McKinney 1987). Criminal negligence is defined as "fail[ing] to perceive a substantial and unjustifiable risk" and thereby engaging in "a gross deviation from the standard of care that a reasonable person would observe in the situation." N.Y. Penal Law § 15.05(4) (McKinney 1987).
 
 
 13
 Under New York state law, a defendant's actions constitute a "sufficiently direct cause of death" if "the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the accused." People v. Kibbe, 35 N.Y.2d 407, 412, 321 N.E.2d 773, 776, 362 N.Y.S.2d 848, 851-52 (1974). In Kibbe, the court found that defendants' act of robbing, partially undressing, and then abandoning a severely intoxicated man on the side of the road would foreseeably lead to death. The victim died when a driver accidentally collided with him. The court found that the driver's act did not constitute a superseding and intervening cause which would relieve defendants of liability for murder. Id. at 413, 321 N.E.2d at 776, 362 N.Y.S.2d at 852.[5]
 
 
 14
 Green argues that the fact that she had administered almost 3,000 colonic treatments without problems until the demise of decedent shows that his death was not foreseeable. The government counters with a quote from an article written by Green, saying "[p]ersons interested in colonics should especially avoid colonic methods that use a high pressure pump to force water into the colon."[6] Green denies that her device was a high pressure system. Forty pounds per square inch, however, is clearly a high level of water pressure. Green's experience renders any denial of knowledge on this point incredible. Given the extreme force provided by Green's device and her own statements regarding the danger of high pressure systems, a jury could have reasonably concluded that Green should have been aware of a risk of death to her customers.
 
 
 15
 Green also argues that the decedent was in complete control of the procedure and therefore his acts constituted a superseding and intervening cause sufficient to relieve her of liability. Green's argument is not persuasive. Green not only provided her client with the instruments of his death but she also encouraged him and other customers to crimp the outflow tube to increase the pressure, thereby heightening the likelihood of death.[7] See Duffy, 584 N.Y.S.2d at 741, 595 N.E.2d at 816, 79 N.Y.2d at 616. Thus, the record contains sufficient evidence of both foreseeability and causation.
 
 
 16
 The record also contains evidence of the appropriate standard of care and Green's violation of it. One medical expert described Green's device and her recommended method of use as dangerous and without medical justification. An expert in hydrocolon therapy testified that a client receiving a colonic should be under constant supervision. Green admittedly did not remain with her client throughout the whole procedure, nor did she witness his decline and death. A jury could rationally conclude that during the two to six hours between the rupture of the client's colon and his death, a reasonable person, especially one knowledgeable about colonics, would have investigated. There is sufficient evidence that Green's conduct in providing the decedent with the colonic device, in advising him to use it in a dangerous manner and in failing to supervise the procedure constituted a gross violation of the relevant standard of care.
 
 
 17
 B. Revocation of Probation for Failure to Pay Fine
 
 
 18
 As the Supreme Court has stated, "the full panoply of rights due a defendant ... does not apply to parole revocations." Morrissey v. Brewer, 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In particular, "[i]f the probationer willfully refused to pay [a fine imposed by the court] or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment." Bearden v. Georgia, 461 U.S. 660, 672, 103 S.Ct. 2064, 2073, 76 L.Ed.2d 221 (1983). Only if the probationer has made good faith efforts to pay a fine and has failed must the court consider alternatives to imprisonment. Id.
 
 
 19
 In this case, the sentencing judge made a specific finding of Green's "willful refusal" to pay the fine imposed by the court. People v. Green, Indictment No. 8700/86, at 8 (N.Y.Sup.Ct. June 21, 1991) (transcript of bench order). Although the probation officer constantly reminded Green of her duty to pay the fine, Green said she wanted to pay her appellate attorney first. When told of her obligation to seek employment in order to obtain the necessary funds, defendant responded that God was her source and she would survive with the help of her friends.[8]
 
 
 20
 Green raises two arguments against the revocation of her probation, but neither has merit. First, she contends that, in declining to find indigency, the sentencing court impermissibly relied on petitioner's change of address to a "high-rent district". Second, she claims that she did not receive adequate notice that her probation could be revoked for failure to pay the fine before the end of the probationary period.[9]
 
 
 21
 During resentencing, the district court noted that petitioner changed her address to 108 East 38th Street without informing the probation office. The judge characterized East 38th Street as a high-rent district, but he did not rely solely on this fact in finding a willful refusal to pay the fine. Green v. Abrams, 798 F.Supp. 149, 154-155 (S.D.N.Y.1992). There was more than adequate evidence of plaintiff's willfulness and lack of effort with regard to payment of the fine. We perceive no constitutional violation on this ground.[10]
 
 
 22
 Green further contends that the written conditions of probation were so vague as to deprive her of due process. The written order did not designate a particular time for payment, but it clearly conditioned the continuation of probation on payment of the fine. According to a statement signed by her, Green understood that the court could revoke probation if she violated a condition. Id. at 154. The probation officer's constant urging to pay the fine should have put Green on notice that immediate attempts at payment were included in the conditions of probation.[11]
 
 
 23
 In conclusion, the state court did not violate Green's due process rights when it revoked her probation for failure to pay the fine imposed on her. The sentencing court properly found that Green willfully refused to pay the fine based on her grudging response to her probation officer's frequent reminders to pay and her professed intention to pay her appellate attorney first. The state court violated no constitutional provision in rejecting Green's attempt to arrange periodic payments to pay the fine. This offer was made only after a probation violation had been found and her sentence had been revoked. If anything, the offer underlined the prior lack of good faith effort. In addition, the written conditions of probation gave Green sufficient notice of possible revocation despite their failure to specify a particular date for payment. Accordingly, the district court's denial of a writ of habeas corpus is affirmed.
 
 C. Appointment of Counsel
 
 24
 As to petitioner's motion to appoint the person of her choosing as counsel, it is well settled in the Second Circuit and elsewhere that "there is no constitutional right to representation by counsel in habeas corpus proceedings." United States ex rel. Wissenfeld v. Wilkins, 281 F.2d 707, 715 (2d Cir.1960); LeFave & Israel, 3 Criminal Procedure § 27.8, at 392-93 (1984). Moreover, an indigent defendant has no right to choose the particular counsel appointed to represent her. See, e.g., Pizarro v. Bartlett, 776 F.Supp. 815, 819 (S.D.N.Y.1991). Finally, this record does not sustain a finding of indigency. Green's motion to appoint counsel is denied.[12]
 
 CONCLUSION
 
 25
 In short, we affirm the district court's denial of a writ of habeas corpus and we deny petitioner's motion to appoint counsel. Petitioner's motion for clarification of the bail order issued by this court is rendered moot by this decision.
 
 
 
 *
 Honorable Jane A. Restani, of the United States Court of International Trade, sitting by designation
 
 
 [1]
 The Appellate Division of the Supreme Court affirmed Green's conviction and the revocation of probation on May 19, 1992. Leave to appeal to the New York Court of Appeals was denied on May 27, 1992
 
 
 [2]
 An appeal from a denial of a writ of habeas corpus may not proceed in the absence of a certificate of probable cause issued by a district or a circuit judge. Fed.R.App.P. 22(b). The district judge who denied the writ in this case issued a "certificate of reasonable doubt" on August 12, 1992. It seems apparent from context that the judge intended to issue a certificate of probable cause. Neither party argues otherwise
 
 
 [3]
 A common indication of rupture is an intense, knife-like pain felt within seconds. Although the cecum contains nerves which sense pressure only, the nerves in the abdominal wall may translate this pressure into pain. Therefore, while the patient may not sense a colon about to burst, he will normally notice the rupture as it occurs
 The only evidence that decedent noticed the rupture of his colon is the testimony of another customer who heard a man call out "Sophie" from either the reception area or the treatment room several times during the evening. The speaker did not indicate that he was in pain and the voice was never positively identified as belonging to the decedent.
 
 
 [4]
 See also Wright v. West, --- U.S. ----, ---- - ----, 112 S.Ct. 2482, 2485-86, 120 L.Ed.2d 225 (1992) (reaffirming the standard set forth in Jackson v. Virginia )
 
 
 [5]
 See also People v. Duffy, 79 N.Y.2d 611, 616, 595 N.E.2d 814, 816, 584 N.Y.S.2d 739, 741 (1992) (suicide is not a superseding and intervening cause of death that relieves defendant of liability for giving decedent bullets and a gun after decedent expressed suicidal impulses); but cf. People v. Pinckney, 38 A.D.2d 217, 219, 328 N.Y.S.2d 550, 552 (1972) (a person who sells heroin and a syringe to someone who dies after injecting the drug is not guilty of criminally negligent homicide because "[a]lthough it is a matter of common knowledge that the use of heroin can result in death, it is also a known fact that an injection of heroin into the body does not generally cause death"), aff'd, 32 N.Y.2d 749, 297 N.E.2d 523, 344 N.Y.S.2d 643 (1973). Pinckney is distinguishable because the New York state legislature, knowing the possible results of heroin use, chose specific penalties for the sale of heroin. Id. at 220-21, 328 N.Y.S.2d at 553-54
 
 
 [6]
 Green & Firth, Welcoming the Water Angel 8-9
 
 
 [7]
 Green argues that all the evidence adduced at trial was circumstantial and that the judge's failure to instruct the jury to that effect violated her due process rights. The record, however, reflects direct as well as circumstantial evidence. Green admitted that she knew high-pressure colonics were dangerous, that she designed the device, and that she gave it to decedent for his use. It is uncontroverted that decedent's use of the device killed him
 
 
 [8]
 The district court allowed Green to proceed in forma pauperis in the habeas corpus action to permit her to preserve her argument as to indigency. Green v. Abrams, No. 92 Civ. 3819, at 1, 1992 WL 230182 (S.D.N.Y. August 27, 1992) (memorandum opinion). That determination, standing alone, does not suggest that indigency rather than bad faith was the reason for her failure to pay the fine
 
 
 [9]
 Green also argues that the court violated the New York Criminal Procedure Law by failing to specify the date of payment. Procedural errors, however, are not appropriate bases for a writ of habeas corpus. See Estelle v. McGuire, --- U.S. ----, ----, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)
 
 
 [10]
 An alternative basis for the judge's decision to revoke probation could have been Green's change of address without notifying the probation office. United States v. Brown, 899 F.2d 189, 193 (2d Cir.1990) ("the probationer who fails to keep his probation officer informed of his residence may be found no longer to merit probation")
 
 
 [11]
 Neither the probation officer nor Green was aware of an exact deadline, but "on each visit" the probation officer informed Green that "this money had to be paid." J.A. at 94
 
 
 [12]
 We also note that Green was able to obtain representation without any promise of payment by this court. As we have stated in the past, the law requires "that the indigent be unable to obtain counsel before appointment will even be considered." Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir.1986), cert. denied sub nom., Hodge v. Colon, --- U.S. ----, 112 S.Ct. 596, 116 L.Ed.2d 620 (1991); see also Cooper v. A. Sargenti Co., 877 F.2d 170, 173 (2d Cir.1989) (quoting Hodge )