UNITED STATES of America, Appellee,

v.

Edward L. GALLO, Defendant, Appellant.

No. 93–1628.

United States Court of Appeals,
First Circuit.

Argued Dec. 9, 1993.

Decided March 31, 1994.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

This appeal tests the propriety of an order revoking appellant's probation and sentencing him to serve a portion of a previously suspended prison term. We affirm.

## I. BACKGROUND

We succinctly summarize the facts necessary to place this appeal into proper perspective, recounting disputed facts in a manner consistent with the district court's supportable findings of fact.

On November 5, 1987, a federal grand jury in the District of Columbia indicted defendant-appellant Edward L. Gallo on a medley of firearms charges.[1] Initially, the district court found appellant incompetent to stand trial and ordered him civilly committed. He was diagnosed as suffering from paranoid schizophrenia, thought to be incurable but, hopefully, controllable through medication. Thereafter, in July of 1989, appellant pleaded guilty to a single count of possessing an unregistered firearm in violation of 26 U.S.C. § 5861(j). The district court then dismissed the remaining five counts of the indictment; sentenced appellant to three years of imprisonment, suspended; placed him on probation for five years; and crafted a special set of conditions ancillary to the probationary term. The first and second conditions possess particular pertinence for present purposes. They read in relevant part:

1. The defendant shall be confined to St. Elizabeth's Hospital for a period of sixty days.

2. Defendant shall continue to submit to proper psychiatric treatment, inclusive of medication, upon his release from impatient [sic] hospitalization and shall consent to the Probation Office having access to his medical records....

Miriam Conrad, Federal Defender Office, for appellant.

Timothy Q. Feeley, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., was on brief, for appellee.

1. Police officers, who were investigating a threat to harm former Secretary of State George Schultz, intercepted Gallo as he emerged from a Washington motel on November 3, 1987. The officers found a small arsenal in the trunk of Gallo's automobile, including a rifle, a sawed-off shotgun, a semi-automatic shotgun, and various types of ammunition.

In fact, appellant stayed at St. Elizabeth's for much longer than sixty days following the imposition of sentence. In the fall of 1990, the hospital discharged him. In the same time frame, three other interrelated events occurred: appellant took up residence at his mother's home in Massachusetts; the sentencing court transferred jurisdiction over the matter to its sister court in the District of Massachusetts; and probation supervision began in that district.

While at St. Elizabeth's, appellant first met Dr. Geller, a Massachusetts-based psychiatrist. After appellant sojourned to Massachusetts, he consulted regularly with Dr. Geller.[2] His course of treatment centered around a monthly injection of haloperidol decanoate (Haldol). The treatment protocol featured gradual decreases in dosage, aimed at lessening the patient's dependence upon the drug. Appellant, who steadfastly maintained that he had no psychiatric disorder and that he should not be on medication at all, favored the dosage-reduction program.

Over a period of more than two years, Dr. Geller decreased Gallo's dosage from 150 milligrams per month to 25 milligrams per month. In January of 1993, however, the doctor noted ominous behavioral changes. For example, appellant began writing of his belief that satellites and lasers were attacking him and threatening national security; in addition, he began acting in a manner reminiscent of how he had behaved immediately prior to his arrest in 1987. When the dosage dropped to 20 milligrams per month, Dr. Geller became concerned that appellant was no longer responding appropriately to the medication. Nonetheless, appellant expressed staunch opposition to resuming heavier doses of Haldol.

The dosage-reduction program continued until May 21, 1993, when Dr. Geller, due in part to Gallo's opposition to increasing the dosage and in part to the reported recurrence of hallucinogenic experiences, advised the probation office of his opinion that "proper psychiatric treatment" demanded "an in-patient psychiatric admission" because Gallo could not "be effectively or safely managed on an outpatient basis."[3] A probation officer immediately visited appellant and informed him of Dr. Geller's recommendation. Appellant debunked the need for inpatient treatment and refused to cooperate. The probation officer concluded that "given Mr. Gallo's current mental state, ... he presents a potential risk to himself and/or others." On the following day, the officer requested that the district court issue a warrant for violation of the conditions attendant to probation.

After an evidentiary hearing, the district court, citing, *inter alia*, the risk to public safety, found that appellant needed inpatient care to determine the proper level of medication and get his treatment program back on track. The court then ruled that appellant had violated the outstanding probation order by refusing to undergo hospitalization. On this basis, the court revoked Gallo's probation, sentenced him to a one-year term of immurement, *see* 18 U.S.C. § 3565(a)(2) (1988) (stipulating that, upon finding a probation violation, a court may "revoke the sentence of probation and impose any other sentence that was available ... at the time of the initial sentencing"), and recommended that appellant serve the sentence in "a facility that can provide the appropriate psychiatric treatment and ... hospitalization." The court also imposed a follow-on term of supervised release, attaching seven special conditions to that term (including a condition requiring continued psychiatric care).

Gallo appeals. Although he parades several assignments of error before us, they march beneath two broad banners. First, appellant challenges the probation order, asseverating that it neither required involuntary hospitalization nor afforded him adequate notice that, by refusing such care, he would be risking imprisonment. Second, he challenges the revocation decision itself, in-

---

**2.** Throughout the course of treatment Dr. Geller submitted periodic reports to the probation office.

**3.** The straw that broke the dromedary's back may have emerged on May 20, when Gallo for the first time voiced an inability to assure Dr. Geller that he would not do something he or others would regret.

cluding the finding that a violation occurred.[4]

## II. THE PROBATION ORDER

The Due Process Clause extends to probation revocation proceedings. *See Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 1759–60, 36 L.Ed.2d 656 (1973). Fair warning of conduct that may result in revocation is an integral part of due process in such situations. *See United States v. Simmons*, 812 F.2d 561, 565 (9th Cir.1987). Here, appellant argues that the conditions of his probation did not require him to acquiesce in hospitalization, or, alternatively, did not provide fair warning that failure to do so might result in revocation. We approach these arguments with full realization that the interpretation of a probation condition and whether it affords a probationer fair warning of the conduct proscribed thereby are essentially matters of law; and, therefore, give rise to *de novo* review on appeal. *See In re Howard*, 996 F.2d 1320, 1327 (1st Cir.1993) (explaining that "unadulterated questions of law" customarily entail plenary review); *cf. Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (establishing standard of *de novo* judicial review for construction of employee benefit plans).

### A. *Scope of the Conditions.*

The threshold question is whether inpatient treatment falls within the scope of the probation order. We believe that the conditions of probation definitely encompass such treatment.

The probation order states that appellant must "continue to submit to proper psychiatric treatment, inclusive of medication,...." We are confident that this broadly phrased directive, read naturally and with due regard for context, covers inpatient care. After all, the sentencing judge attached no qualifiers or words of limitation to the requirement of treatment, other than that the treatment be "proper" and "psychiatric." And in terms of language, we deem it significant that the condition directs that appellant "*continue* to submit to proper psychiatric treatment...." (Emphasis supplied.) When this verb usage is examined against the backdrop of the immediately preceding condition, which memorializes that appellant "shall be confined to St. Elizabeth's Hospital" for his initial treatment,[5] continuation of that treatment cannot fairly be read to exclude further hospitalization. And, moreover, an expansive reading is especially compelling in light of the incurable nature of appellant's illness and his previous three-year stay in a psychiatric hospital.

We think, too, that the circumstances surrounding the probation order necessitate such an interpretation. The plea agreement commemorated appellant's understanding that he would have to report on a regular basis to a "mental health physician chosen by the government" and "follow the doctor's instructions unless excused by an order of the Court." Thus, the plea agreement made pellucid that appropriate medical care lay at the heart of the agreed disposition of appellant's case—and hospitalization is a mainstay of appropriate medical care. Moreover, the probationary period was to last for five years; during so lengthy a span, it was certainly foreseeable that appellant's medical needs might evolve in such a way as to require rehospitalization. Put bluntly, inpatient care, having proved necessary in the past, was well within the universe of treatment modalities that might prove "proper" in the future.

Under the circumstances of this case, it is beyond serious question that the words "proper psychiatric treatment" were intended to include—and did include—the possibility of hospitalization. Consequently, we re-

---

4. Initially, appellant also claimed that the district court, in sentencing him to a period longer than that suggested in U.S.S.G. § 7B1.4, failed adequately to consider the Sentencing Commission's policy statement. Since appellant has now served the one-year sentence in full, he has withdrawn this claim. But because he is still serving the supervised release term, the same circumstance does not render the remainder of his appeal moot. *See, e.g., Carafas v. LaVallee*, 391

U.S. 234, 237, 88 S.Ct. 1556, 1559, 20 L.Ed.2d 554 (1968) (holding that, although a sentence has been served, the presence of "collateral consequences" can save a case from mootness).

5. By like token, Condition No. 2 itself states that it is to take effect "upon [Gallo's] release from impatient [sic] hospitalization...."

ject appellant's complaint that the conditions attached to his probation did not require submission to inpatient medical care.

### B. *Sufficiency of the Warning.*

Appellant has a fallback position. He strives to persuade us that, even if the written conditions extended to enforced hospitalization, they did not afford him adequate notice that refusal to accept such treatment would constitute a violation of his probation. In studying this proposition, we must ask whether appellant was chargeable with knowledge of the probation order's inclusive requirements (and the penalties that might be imposed for disregarding those requirements) when he spurned the request to admit himself to the hospital.

 When, as now, a court order is read to proscribe conduct that is not in itself unlawful, the dictates of due process forbid the forfeiture of an actor's liberty by reason of such conduct unless he is given fair warning. *See United States v. Grant,* 816 F.2d 440, 442 (9th Cir.1987); *United States v. Dane,* 570 F.2d 840, 843 (9th Cir.1977), *cert. denied,* 436 U.S. 959, 98 S.Ct. 3075, 57 L.Ed.2d 1124 (1978); *see also Marks v. United States,* 430 U.S. 188, 191, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977) (discussing fair warning in respect to conduct that is deemed criminal); *Bouie v. City of Columbia,* 378 U.S. 347, 351, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964) (similar). Nevertheless, the fair warning doctrine does not provide a safe harbor for probationers who choose to ignore the obvious.

 Furthermore, though a probationer is entitled to notice of what behavior will result in a violation, so that he may guide his actions accordingly, fair warning is not to be confused with the fullest, or most pertinacious, warning imaginable. Conditions of probation do not have to be cast in letters six feet high, or to describe every possible permutation, or to spell out every last, self-

evident detail. *See Green v. Abrams,* 984 F.2d 41, 46–47 (2d Cir.1993) (holding that, though a probation order did not specify the time for payment of a fine, it gave sufficient notice that failure to pay the fine would work a violation); *see also United States v. Ferryman,* 897 F.2d 584, 590 (1st Cir.) (noting in an analogous context that defendants are entitled only to "fair notice," not "letter perfect notice"), *cert. denied,* 498 U.S. 830, 111 S.Ct. 90, 112 L.Ed.2d 62 (1990). Conditions of probation may afford fair warning even if they are not precise to the point of pedantry. In short, conditions of probation can be written—and must be read—in a commonsense way.

Adherence to these principles demands that we uphold the adequacy of the warning furnished here. We have three main reasons for reaching this conclusion. First, we cannot fault the district court's finding that the phrase "proper psychiatric treatment, inclusive of medication," on the basis of its plain meaning, *see supra* Part II(A), put appellant on notice that a refusal to follow doctor's instructions and submit to hospitalization would constitute a violation of the probation order.[6] *Cf., e.g. Mace v. Amestoy,* 765 F.Supp. 847, 849–50 (D.Vt.1991) (ruling that a condition of probation requiring participation in and completion of a "sexual therapy program" put defendant on notice that therapy might necessitate admitting his sexual misconduct). The challenged condition, read in context, itself provided fair warning.

Second, there is nothing in the record to suggest either that appellant acted under a misapprehension or that he believed a refusal to accept inpatient admission would comport with the conditions of his probation. A probationer who does not advance a credible claim that he was unaware, or misunderstood the scope, of the conditions of his probation is hard pressed to claim that he lacked fair warning. *See, e.g., United States v. Laughlin,* 933 F.2d 786, 790 (9th Cir.1991). So it is here.

---

**6.** Appellant contends that, under *Simmons,* 812 F.2d 561, a probationer is routinely entitled to receive more specific notice of proscribed behavior than that delivered by means of formal conditions of probation. We disagree. A careful reading of the passage cited by appellant indicates

that our view coincides with that of the *Simmons* court. When the proscribed behavior is not itself criminal in nature, formal conditions of probation, plainly written, are generally thought to supply sufficient actual notice of proscribed activities. *See id.* at 565.

■ Finally, the inquiry into fair warning is not necessarily confined to the four corners of the probation order. *See Grant,* 816 F.2d at 442; *United States v. Romero,* 676 F.2d 406, 407 (9th Cir.1982). The meaning of a probation order may be illuminated by the judge's statements, the probation officer's instructions, or other events, any or all of which may assist in completing the notification process and in aiding the court to determine whether a probationer has been forewarned about what conduct could be deemed to transgress the probation order.

■ Here, several pieces of data buttress the district court's finding that appellant received fair warning. In the first place, the plea agreement provided a prism through which the conditions of probation could be read—and that agreement made the scope of the conditions very clear. *See supra* pp. 11–12. In the second place, appellant signed his name below the list of conditions contemporaneous with the imposition of the original sentence. In this fashion, he signified his understanding that, upon a finding of a violation, probation might be revoked. Such a manifestation of acceptance of the terms, though rebuttable, is *prima facie* evidence of a probationer's knowing acceptance of the conditions in place at the time probation commenced. *See, e.g., Green,* 984 F.2d at 47; *United States v. Barth,* 899 F.2d 199, 203 (2d Cir.1990), *cert. denied,* 498 U.S. 1083, 111 S.Ct. 953, 112 L.Ed.2d 1042 (1991).

It is also significant that both the probation officer and the court repeatedly explained to appellant the risk he was running. The record reflects that the probation officer told appellant on May 21 that Dr. Geller believed inpatient treatment was essential to meet the goal of "proper psychiatric treatment" and exhorted appellant to comply. Such a conversation may be considered as a component of the notification process. *See, e.g., Green,* 984 F.2d at 47; *Romero,* 676 F.2d at 407; *Mace,* 765 F.Supp. at 849–50. Furthermore, the district judge, who exhibited great sensitivity in his thoughtful handling of a difficult case, urged appellant on more than one occasion to relent and told him in no uncertain terms that, if his intransigence did not abate, he would be found in violation of the probation order.

To sum up, appellant timely received the probation order; the conditions of probation contained therein clearly contemplated inpatient care if medically indicated; and the penalties that might flow from violating those conditions were apparent. Given the unvarnished terms of the special condition, appellant's previous three-year hospital stay, the tenor of the plea agreement, the probation officer's guidance, and the district judge's entreaties, appellant received ample notice of both the proscription against refusing inpatient treatment and the possible, if not certain, consequence of persisting in his chosen course of conduct.

## III. THE REVOCATION DECISION

■ The standard of appellate review pertaining to revocation decisions is not in doubt. When a district court, after holding an evidentiary hearing, finds a probation violation and determines that revocation is a condign response, we will not prepare a palimpsest, but will scrutinize the district court's decision only for abuse of discretion. *See Burns v. United States,* 287 U.S. 216, 222, 53 S.Ct. 154, 156, 77 L.Ed. 266 (1932); *United States v. Nolan,* 932 F.2d 1005, 1006 (1st Cir.1991); *United States v. Morin,* 889 F.2d 328, 331 (1st Cir.1989).

■ To reach the point at which revocation of probation is appropriate, a district court must complete a two-step pavane. The first component is historical; it involves the "retrospective factual question whether the probationer has violated a condition of probation." *Black v. Romano,* 471 U.S. 606, 611, 105 S.Ct. 2254, 2257, 85 L.Ed.2d 636 (1985). The second component is judgmental; it involves "a discretionary determination by the sentencing authority whether violation of a condition warrants revocation of probation." *Id.* We proceed to review the district court's determinations as to each component, mindful, withal, that "[t]he Due Process Clause ... imposes procedural and substantive limits on the revocation of the conditional liberty created by probation." *Id.* at 610, 105 S.Ct. at 2257.

## A. *The Violation.*

At a revocation proceeding, the prosecution need not prove the conduct charged beyond a reasonable doubt; it is enough if the proof, reasonably viewed, satisfies the court that a violation occurred. *See United States v. Gordon,* 961 F.2d 426, 429 (3d Cir. 1992); *United States v. Czajak,* 909 F.2d 20, 22 (1st Cir.1990); *United States v. Lacey,* 661 F.2d 1021, 1022 (5th Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2036, 72 L.Ed.2d 484 (1982).

The government met this burden in the instant case. Despite being fully apprised of Dr. Geller's views and receiving an urgent request from the probation officer, appellant did not agree to institutionalize himself. Even after the judge drew a line in the sand, appellant remained adamant in his insistence that he would not submit to inpatient care. On this stark record, the district court's explicit finding that appellant knowingly and wilfully elected to ignore a condition of his probation is entirely supportable. It follows that the first step in the two-step pavane is easily ventured.[7]

## B. *The Disposition.*

When revocation of probation is committed to judicial discretion, judges should not regard it as a routine response to every probation violation. Rather, revocation should be reserved for those instances in which the case history, coupled with the probationer's behavior, indicates that it is a fair, just, and sensible outcome. *See, e.g., Nolan,* 932 F.2d at 1006; *United States v. Fryar,* 920 F.2d 252, 257 (5th Cir.1990), *cert. denied,* 499 U.S. 981, 111 S.Ct. 1635, 113 L.Ed.2d 730 (1991); *see also* Steven A. Childress & Martha S. Davis, *Federal Standards of Review,* § 11.39 at 11–161 (2d ed. 1986). This second step of the revocation analysis necessitates individualized attention to the particular probationer and to the idiosyncratic circumstances of his situation. And, it requires a

predictive decision, based in part on the court's assessment of the probationer's propensity toward antisocial conduct. *See Lacey,* 661 F.2d at 1022; *United States v. Reed,* 573 F.2d 1020, 1024 (8th Cir.1978).

Although the trial court possesses wide latitude in making such determinations, that latitude is not unbounded. The test for abuse of discretion is well settled in this circuit:

> In making discretionary judgments, a district court abuses its discretion when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales.

*United States v. Roberts,* 978 F.2d 17, 21 (1st Cir.1992); *accord, e.g., Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir.1988); *United States v. Hastings,* 847 F.2d 920, 924 (1st Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988). Applying this test, we are unable to discern any smidgen of abuse in the district court's decision to revoke probation in order to ensure that appellant receive necessary medical treatment. Based on a careful combing of the record we conclude that the court considered all the appropriate factors and made no detectable mistake in weighing them.

Nor is this conclusion undercut by appellant's lament that the district court, in revoking probation, impermissibly punished him for faultless conduct. This thesis finds its genesis in appellant's view that because his mental health status is involuntary (most recently induced, he claims, by the government, which placed him on, then tried to wean him away from, Haldol), revocation of probation is an improper punishment for it. This argument is lame. *See Bearden v. Georgia,* 461 U.S. 660, 668 n. 9, 103 S.Ct.

---

7. Appellant argues that there was no *medical* need for hospitalization, but merely an *administrative* need, *i.e.,* a desire to husband the costs of supervision. Assuming, without deciding, that this is a meaningful distinction, we nonetheless reject the argument. Dr. Geller's testimony at

the revocation hearing, fully credited by the district court, made it clear that he treated appellant as he would have treated any other similarly afflicted patient, and that hospitalization was needed as an integral part of "proper psychiatric treatment."

2064, 2070 n. 9, 76 L.Ed.2d 221 (1983) (explaining that "the probationer's lack of fault in violating a term of probation [does not] necessarily prevent a court from revoking probation"). In this vein, *United States v. Brown*, 899 F.2d 189, 193 (2d Cir.1990), appropriately reminds us that "though a probation violation may result in incarceration . . ., this punishment is imposed not for the violation itself but for the prior criminal offense for which the probationer was convicted."

We will not belabor the obvious, for it is difficult to imagine a much clearer case than the case at bar., As appellant's outpatient treatment program progressed, his mental and social state deteriorated; he began hallucinating about messages from inanimate objects and felt threatened by satellites. Moreover, he made it plain that he did not consider himself mentally ill; that, left to his own devices, he would not take medication to alleviate the manifestations of his disorder; and that he would not submit voluntarily to inpatient care. Especially in light of appellant's defiance of the doctor's instructions and his previous involvement in threats of grievous bodily harm against a public official, his situation called out for remediation. The district court, after finding that appellant had violated the terms of probation, simply answered the call, effecting a disposition that ensured appropriate treatment for appellant's affliction and, at the same time, alleviated a cognizable risk to public safety.

## IV. CONCLUSION

We need go no further.[8] In the original case, appellant gained his liberty subject to a condition of probation that required him to submit to inpatient psychiatric treatment when medically indicated. Having been fairly warned of the prospective consequences of intransigence, he nonetheless chose to flout the condition. Thereafter, he turned his back on numerous opportunities to deliver himself from the revocation proceeding by

agreeing to enter the hospital. In the circumstances of this case, the lower court did not err in finding a violation of the probation order, revoking appellant's probationary status, and imposing a one-year incarcerative sentence, followed by a term of supervised release.

*Affirmed.*

---

8. The question of appellant's competency at the time of revocation is not before us. Appellant did not make a claim of incompetency; no party sought a competency hearing, *see* 18 U.S.C. § 4241(a) (1988); and the record contains no evidence of cause sufficient to impel a court, *sua sponte,* to launch an inquiry into competency. A

history of psychiatric treatment, in and of itself, does not require a court to convene a competency hearing on its own initiative. *See Hernandez–Hernandez v. United States*, 904 F.2d 758, 760–61 (1st Cir.1990); *see also United States v. Teague,* 956 F.2d 1427, 1431–32 (7th Cir.1992); *Hernandez v. Ylst*, 930 F.2d 714, 717–18 (9th Cir.1991).