STATE OF CONNECTICUT *v.* JOHN REILLY
(AC 20121)

Foti, Zarella and Dupont, Js.

Argued September 12—officially released November 14, 2000

*Richard W. Callahan*, special public defender, for the appellant (defendant).

*Jessica C. Torres-Daigle*, special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael A. Pepper*, assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, John Reilly, appeals from the trial court's judgment, rendered pursuant to General Statutes § 53a-32,[1] revoking his probation and commit-

---

[1] General Statutes § 53a-32 provides in relevant part: "(a) At any time during the period of probation . . . . the court or any judge thereof may issue a warrant for the arrest of a defendant for violation of any of the conditions of probation . . . . Thereupon, or upon an arrest by warrant as herein provided, the court shall cause the defendant to be brought before it without unnecessary delay for a hearing on the violation charges. At such hearing the defendant shall be informed of the manner in which he is alleged to have violated the conditions of his probation . . . shall be advised by the court that he has the right to retain counsel and, if indigent, shall be entitled to the services of the public defender, and shall have the right to cross-examine witnesses and to present evidence in his own behalf.

"(b) If such violation is established, the court may: (1) Continue the

ting him to the custody of the commissioner of correction to serve the suspended portion of his previously imposed sentence. On appeal, the defendant asserts that he was denied federal constitutional due process because (1) he was not given prior fair warning that the conditions of his probation proscribed the particular conduct claimed to be in violation of the terms of his probation and (2) the violations found were inconsistent with those violations alleged in the state's information.[2] The defendant also claims that the court abused its discretion by revoking his probation and sentencing him to serve fourteen months incarceration.[3]

The facts and sequence of events play an important role in the disposition of this case. Accordingly, we recite them in detail. Given those facts and the claims of the defendant, this case is one of first impression in Connecticut. On July 12, 1994, the defendant pleaded guilty to sexual assault in the third degree in violation of General Statutes § 53a-72a, a class D felony. The court sentenced him to a period of four years incarceration, execution suspended after one year, with five years probation.

sentence of probation . . . (2) modify or enlarge the conditions of probation . . . (3) extend the period of probation . . . provided the original period with any extensions shall not exceed the periods authorized by section 53a-29; or (4) revoke the sentence of probation . . . . If such sentence is revoked, the court shall require the defendant to serve the sentence imposed or impose any lesser sentence. Any such lesser sentence may include a term of imprisonment, all or a portion of which may be suspended entirely or after a period set by the court, followed by a period of probation with such conditions as the court may establish. No such revocation shall be ordered, except upon consideration of the whole record and unless such violation is established by the introduction of reliable and probative evidence and by a preponderance of the evidence."

[2] Although the defendant failed to preserve these two issues properly, we review them pursuant to State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). There is an adequate record and the claim is of constitutional magnitude.

[3] In view of our conclusion that the defendant was denied due process, we need not reach this claim.

On April 12, 1995, the defendant was released from custody and began his five year probation. The court imposed several conditions of probation. The condition relevant to this appeal was the requirement that the defendant receive sex offender treatment.[4] On May 23, 1995, the defendant's probation officer, Suzanne Kuziak, reviewed the terms of probation with the defendant. The defendant, acknowledging and agreeing to abide by the terms and conditions of his probation, signed the standard "General Terms of Probation" form. Shortly thereafter, Kuziak referred the defendant to the Special Services Center for the Treatment of Problem Sexual Behavior (special services)[5] for sex offender therapy. On June 14, 1995, before the defendant participated in the therapy sessions, he and special services entered into an agreement that enumerated the agency's expectations and the defendant's obligations.[6]

From June, 1995, to July 1, 1998, the defendant attended weekly group therapy meetings and received

[4] The court imposed the standard ten conditions of probation and six additional, court-ordered special conditions: (1) sex offender treatment, (2) substance abuse evaluation and treatment as deemed necessary, (3) psychological-psychiatric evaluation and treatment as deemed necessary, (4) no unsupervised contact with children under eighteen years old, (5) no contact with the victim and (6) restitution up to $1500 for verified, unreimbursed uninsured expenses.

[5] Special services contracts with the state's office of adult probation to provide sex offender treatment to those probationers referred for assessment and treatment. It conducts group therapy sessions in the office of adult probation.

[6] In relevant part, the treatment contract provided: "I agree to fully participate in treatment sessions. I agree to comply with agency expectations regarding capacity to pay for services." The final provision stated: "I understand and agree that any violation of the conditions (1-10) of this contract may be grounds for termination from the program at the discretion of the staff. I also understand that my probation/parole officer and/or [department of children and families] worker may be notified immediately of any violation of this contract." With the exception of the two provisions noted above, regarding full participation and payment, conditions one through ten are not relevant to this appeal.

treatment from special services. According to the atten-
dance records, the defendant was present at least 160
times and rarely missed a meeting.[7] During that three
year period, Jim Hughes, the defendant's sex offender
therapist, completed twenty-nine monthly or bimonthly
reports on the defendant's progress. The vast majority
of the reports indicated that the defendant actively par-
ticipated in the sessions.

The defendant's problems with special services began
in May, 1998. According to Hughes, the defendant often
took notes while other members spoke during therapy
sessions. Although special services did not have a for-
mal policy forbidding note-taking,[8] and indeed Hughes
on occasion referred to the defendant as the group's
secretary and historian, Hughes and the other counsel-
ors nevertheless met to determine the propriety of the
defendant's note-taking. They concluded that note-tak-
ing undermined the defendant's progress and treatment.
The note-taking triggered concerns that such behavior
prevented the defendant from fully relating to and inter-
acting with other group members, and concerns about
how the defendant intended to use the notes.

On May 28, 1998, Kuziak learned that the defendant
may have been placing bets at an offtrack betting facil-
ity.[9] Kuziak contacted Hughes because she thought that
the defendant's possible gambling might violate the
terms of his therapy. On June 3, 1998, during one of
the sessions, Hughes confronted the defendant about
his alleged gambling. Hughes suggested that if the

---

[7] According to the progress reports of special services, his absences from
a few sessions were generally attributable to illness and therefore were
excused. The defendant never exceeded the two allowable clinical misses
during a twelve month period.

[8] During the probation revocation hearing, a letter indicating that special
services encourages note-taking was introduced as an exhibit.

[9] The defendant denied the accusation, and evidence at the probation
violation hearing conflicted as to whether the defendant did indeed place
bets.

defendant had money to gamble, perhaps he was no longer under financial hardship justifying a copayment reduction for the therapy sessions. Consequently, special services increased his per session fee from $7 to $15.[10] The defendant became upset about the increase and refused to sign the new fee arrangement.

Additionally, Hughes discussed with the defendant the concerns prompted by his note-taking and asked him to refrain from it in the future. Testimony at the violation of probation hearing conflicted as to the extent to which the defendant continued to take notes despite Hughes' request. The defendant claimed that he confined his subsequent note-taking to permissible periods, namely during blackboard or other presentations. Hughes maintained, however, that the defendant continued to take notes while others spoke.

On June 11, 1998, the defendant filed a grievance against Hughes. It alleged, inter alia, that Hughes' handling of the fee increase in a nonprivate manner, in front of group members, served to "demean, threaten and debase" the defendant.[11] According to the grievance, the defendant felt that his progress at the New Haven group suffered because of conflicts with the staff. Notably, the defendant formally requested a transfer to the Middletown sex offender group. On this date, the defendant also requested, pursuant to the Freedom of Information Act, General Statutes (Rev. to 1997) § 1-7 et seq., now § 1-200 et seq., a copy of the contract between special services and the state.

---

[10] Each member of the sex offender treatment program is assessed a fee for services based on a sliding fee scale. Special services originally had assessed the defendant's fee at $5 per session. It subsequently raised it without incident to $7.

[11] The grievance letter also alleged that the New Haven special services staff continually threatened the group members with violations and reincarceration if they refused to follow orders. The defendant's grievance letter also states that his notes document the civil rights violations that he had suffered at special services over the past three years.

During a July 1, 1998 meeting with Kuziak, the defendant stated that he planned to transcribe his therapy notes. He also stated that he had spoken to other group members outside of the therapy sessions and would likely subpoena those members in connection with a lawsuit he intended to bring against special services. Kuziak, in turn, reported this information to Hughes.

The defendant attended his last therapy session on July 1, 1998. Hughes completed a progress report for that final session and reported that the defendant had actively participated in the group discussions. Hughes also noted in the report that the defendant cooperated during the reassessment of his fee.[12] Finally, the report stated that the defendant had resisted the directive to cease his note-taking.

On July 6, 1998, special services officially discharged the defendant from the treatment program and notified Kuziak of the discharge by letter. The letter cited two principal reasons for the discharge.[13] First, it explained

[12] The fee reassessment portion of the final progress report, written by Hughes, seems to conflict squarely with the discharge letter Hughes drafted several days later. See footnote 13. The note also appears at odds with Kuziak's testimony that Hughes informed her on July 2, 1998, that the defendant refused to sign the new fee agreement.

[13] The discharge letter addressed to Kuziak read:

"We discharged Mr. Reilly from specialized sex offender treatment here at Special Services.

"Considering that Mr. Reilly told you he discussed impending court action with group members in conversations outside of treatment meetings, and that he has told them they will be brought into the court for testimony, we have concluded that Mr. Reilly has violated his treatment contract. In essence, his conversations outside of group are considered threatening behavior which adversely affect the treatment of the other group members. In addition, we recently reassessed Mr. Reilly's fee and raised it to the $15 minimum. However, Mr. Reilly refused to sign his new fee agreement. Again, Mr. Reilly has failed to comply with treatment expectations.

"Sex offender treatment involves the confrontation of inappropriate behavior and patterns of thinking. Members are required to keep the discussion of their therapeutic issues within the structured group setting. When members begin working their issues out by engaging in side conversations outside group, the therapeutic value of the session is compromised. Worse,

that the defendant's conversations with group members outside of group therapy and his threats to subpoena group members "violated his treatment contract." Second, the letter noted that the defendant fell short of treatment expectations when he refused to sign his new fee agreement. Conspicuously absent from the list of reasons for his discharge was any reference to note-taking. Hughes notified the defendant of his discharge in person on July 8, 1998.

On August 26, 1998, Kuziak executed an affidavit stating that she had probable cause to believe the defendant violated a condition of his probation. Specifically, Kuziak's affidavit alleged that the defendant's discharge resulted from a fee arrangement dispute and conversations the defendant had with members outside of therapy sessions. The state then signed an information that charged the defendant with a probation violation consistent with Kuziak's affidavit.

On October 19, 1998, the court issued a warrant for the defendant's arrest. The defendant voluntarily turned himself in on October 30, 1998. The court then released him on a promise to appear in court.

The probation violation hearing began on April 8, 1999, and concluded on September 15, 1999. During the hearing, Hughes and Kuziak testified about the events leading up to and surrounding the defendant's discharge. The court also heard from several psychologists and psychiatrists, both treating and nontreating, who testified as to the defendant's mental state. It was undisputed that the defendant was a decorated Vietnam War veteran who suffers from alcohol dependence, bipolar disorder and post-traumatic stress disorder.

On September 29, 1999, the court found by a preponderance of the evidence that "special services had a

when members engage in threatening behavior outside of group the other participants are harmed and cannot effectively participate in treatment."

legitimate concern and motivation for telling the defendant or ordering the defendant to discontinue the note-taking during the group sessions due to the perceived harm it posed to other group members in terms of breaching their expectation of confidentiality. [The court was] also satisfied [that] the defendant became so engrossed in his pursuit of the lawsuit against special services that he did refuse to stop the note-taking, that he did become disruptive and resistant and uncooperative and became something of an uncooperative force within the group, threatening to use the transcribed notes from group sessions, threatening to subpoena group members and so on both during and outside group sessions affecting not only his own progress with respect to the sex offender treatment but the progress of others and all this in an effort to pursue his suit and get support from other group members for the lawsuit."

In light of those findings, the court determined that special services had properly discharged the defendant for his conduct. The court found, however, that the evidence did not support a probation violation on the basis of the fee dispute. After finding that the defendant "willingly and intentionally" chose not to comply with the special condition of his probation requiring that he attend sex offender therapy, the court revoked his probation and sentenced him to a lesser term of fourteen months imprisonment.

I

As of the date of oral argument in this court, the defendant was no longer incarcerated, having served the requisite sentence. We first consider whether the defendant's appeal is moot because we can no longer afford him any practical relief.

If the resolution of a criminal appeal can create collateral consequences prejudicial to the interests of an appellant, jurisdiction over the appeal remains, even if

the appellant has already served the sentence given. *State* v. *Collic*, 55 Conn. App. 196, 201, 738 A.2d 1133 (1999); see also *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 225–26, 756 A.2d 1264 (2000). "The collateral consequences of a conviction are legion: subsequent convictions might, as a result, carry heavier penalties and a wide range of civil rights might be affected, including a defendant's eligibility to hold public office." *Barlow* v. *Lopes*, 201 Conn. 103, 112–13, 513 A.2d 132 (1986); see also *State* v. *Smith*, 207 Conn. 152, 159–62, 540 A.2d 679 (1988). The potential for harm to the defendant if we spurn his appeal is of sufficient magnitude to overcome any claim of mootness. We therefore retain the appeal and decide its merits.

## II

We now turn to the first issue, namely whether the court violated the defendant's due process rights. Our analysis begins with a brief discussion of the rights attendant to a probation violation hearing. The hearing itself involves two distinct components. Initially, the court conducts an adversarial evidentiary hearing to determine whether the defendant has indeed violated a condition of probation.[14] *State* v. *Davis*, 229 Conn. 285, 289, 641 A.2d 370 (1994); *State* v. *Gaston*, 56 Conn. App. 125, 129, 741 A.2d 344 (1999). The state must establish a violation of probation by a fair preponderance of the evidence. *State* v. *Davis*, supra, 295. That is to say, "the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation." Id., 302. This court will not disturb a trial court's factual determination that a violation has occurred unless that determination is clearly erroneous. *State* v. *Treat*, 38 Conn. App. 762, 769, 664 A.2d 785, cert. denied, 235 Conn. 920, 665

---

[14] That determination implies that the condition was valid and that the defendant had fair notice of it.

A.2d 907 (1995); *State* v. *Scott*, 31 Conn. App. 660, 668, 626 A.2d 817 (1993).

Second, if the evidence supports a violation, the court exercises its discretion and determines whether the beneficial, rehabilitative purposes of probation are still being served or whether the need to protect the public outweighs the probationer's interest in liberty. *State* v. *Davis*, supra, 229 Conn. 297. Thus, an appellate court will affirm an exercise of discretion reinstating an original sentence or ordering incarceration, absent a manifest abuse of discretion or injustice requiring reversal. *Walker* v. *Commissioner of Correction*, 223 Conn. 411, 414–15, 611 A.2d 413 (1992), overruled in part on other grounds, *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994).

Probation revocation proceedings fall within the protections guaranteed by the due process clause of the fourteenth amendment of the federal constitution. *Gagnon* v. *Scarpelli*, 411 U.S. 778, 782, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973). That clause provides in relevant part: "[N]or shall any State deprive any person of life, liberty or property, without due process of law . . . ." U.S. Const., amend. XIV, § 1. Probation itself is a conditional liberty and a privilege that, "once granted, is a constitutionally protected interest." *State* v. *Davis*, supra, 229 Conn. 294. The revocation proceeding must comport with the basic requirements of due process because termination of that privilege results in a loss of liberty. Id.

The vast majority of probation revocation appeals test the sufficiency of the evidence offered at the evidentiary hearing phase of the proceedings to prove that a condition of probation was violated. This case is not, however, a straightforward evidentiary challenge. Here, both parties accept the court's factual conclusions. Both parties agree that the defendant took notes during

therapy sessions, that he spoke with other members outside scheduled meetings and that he discussed the possibility of subpoenaing fellow members in a potential lawsuit against special services. Where the two parties diverge, however, is on the question of whether the conditions of the defendant's probation proscribed those activities and, if so, whether the defendant had notice of those proscriptions. The first question for us to resolve, therefore, is not whether the defendant engaged in particular conduct, but whether his conduct could constitute a violation of a valid condition of probation on the facts of this case.

The defendant does not argue that the state failed to prove by a preponderance of the evidence that he took notes during sessions[15] or that he spoke to other members outside of group sessions. Instead, he argues that as a matter of law, he lacked notice of the conditions that the court found that he violated, namely that he not speak to group members outside of group therapy sessions and that he not threaten to subpoena group members. The assertions that the defendant lacked prior notice of the conditions underlying the probation revocation and that the conditions that the court found that he violated were inconsistent with the violations alleged in the information are questions of law for which our review is plenary. That precise question is whether the trial court revoked his probation without due process of law. See *State* v. *Lewis*, 58 Conn. App. 153, 157, 752 A.2d 1144, cert. denied, 254 Conn. 917, 759 A.2d 508 (2000). "[T]he interpretation of a probation condition and whether it affords a probationer fair warning of the conduct proscribed thereby are essentially mat-

---

[15] The discharge letter from special services did not cite note-taking as a reason for discharge, nor did the state's information that charged the defendant with a probation violation. The note-taking is only obliquely involved in the defendant's threat to use his notes in connection with a lawsuit he was contemplating bringing against special services.

ters of law and, therefore, give rise to de novo review on appeal." *United States* v. *Gallo*, 20 F.3d 7, 11 (1st Cir. 1994). The condition to be interpreted in this case is that the defendant "obtain sex offender treatment."

We first consider whether the defendant received fair warning that his behavior would result in a revocation of probation. Due process requires, at a minimum, that an individual receive notice of probation conditions and an opportunity to be heard.[16] The defendant claims a deprivation of the former of those two requirements. The purpose of notice of conditions is to ensure that the probationer understands the precise terms of his obligations and that he risks termination of his probation if he fails to meet those obligations.

Written conditions of probation formally imposed by a court order usually provide notice sufficient to satisfy due process.[17] Therefore, where there is an alleged violation of an explicit condition, it would be difficult for a defendant to claim successfully that he was denied due process on the ground of no fair notice. Obviously, a finding of actual notice impliedly includes a finding of fair notice.

Where criminal activity forms the basis for the revocation of probation, the law imputes to the probationer the knowledge that further criminal transgressions will result in a condition violation and the due process notice requirement is similarly met. "An inherent condition of any probation is that the probationer not commit further violations of the criminal law while on probation." *State* v. *Lewis*, supra, 58 Conn. App. 157–58.

---

[16] General Statutes § 53a-32 enumerates the due process protections attendant to a probationer's opportunity to be heard during a revocation hearing. See footnote 1.

[17] Even if the conduct is proscribed by a condition in a noncriminal case, the defendant is entitled to fair warning that his liberty is at risk if he violates the condition. *United States* v. *Gallo*, supra, 20 F.3d 10.

Where noncriminal activity forms the basis for the revocation of probation, due process requires specific knowledge that the behavior involved is proscribed.[18] " '[W]here the proscribed acts are not criminal, due process mandates that the [probationer] cannot be subject[ed] to a forfeiture of his liberty for those acts unless he is given prior fair warning.' *United States* v. *Dane*, 570 F.2d 840, 844 (9th Cir. 1977), cert. denied, 436 U.S. 959, 98 S. Ct. 3075, 57 L. Ed. 2d 1124 (1978)." *State* v. *Lewis*, supra, 58 Conn. App. 157; see also *State* v. *Hoffler*, 55 Conn. App. 210, 217 n.2, 738 A.2d 1145, cert. denied, 251 Conn. 923, 742 A.2d 360 (1999) (impliedly recognizing differing notice requirements for lawful, unlawful acts).

Those principles guide us in considering whether the defendant violated any formal court-imposed condition of probation, and we conclude that no condition of court-ordered probation specifically prohibited the defendant's conduct. The only special condition of the court-ordered probation even remotely related to the court's finding of a violation was that he obtain sex offender treatment. It is undisputed that the defendant did obtain sex offender treatment and faithfully attended treatment sessions from June 14, 1995, through July 1, 1998.

Next, we dispose of any argument that due process was satisfied because the defendant had imputed knowledge of the condition. Neither party maintains that criminal activity constituted the alleged violation, and the law imputes notice to the defendant only in those cases involving criminal behavior.

---

[18] A statutory exception to actual notice where the behavior is noncriminal exists in cases where the defendant is ordered to undergo sex offender treatment but refuses to acknowledge that he committed the acts with which he is charged. In such cases, the defendant is deemed to be in violation of a condition of probation. General Statutes § 53a-32a.

Finally, we discuss the last method of satisfying due process in the context of probation revocation, namely whether the defendant had knowledge of the alleged condition. Unless the defendant received prior fair warning that his acts could result in revocation of probation, the court's revocation violated due process. The court explicitly found that the defendant violated the terms of his probation when he threatened to use his notes from group therapy sessions and threatened to subpoena group members in connection with his putative lawsuit, both outside and during group sessions. Similarly, the charging document in this case alleged that the defendant had engaged in outside conversations with group members and had threatened to subpoena group members in connection with a contemplated lawsuit. The defendant's claim, therefore, that the information did not allege a condition that the court found him to have violated must fail. The relevant question, therefore, becomes whether the defendant had notice, or prior fair warning, that the behavior charged, and found to have occurred, would precipitate a possible revocation of his probation.

In *United States* v. *Gallo,* supra, 20 F.3d 7, the United States Court of Appeals for the First Circuit, in deciding that question, found no due process violation in a revocation decision because the probationer had sufficient notice that his conduct would lead to revocation. In *Gallo,* the court required the probationer to submit to proper psychiatric treatment and found him in violation when he refused certain medications and inpatient treatment. "It [was] also significant that both the probation officer and the court *repeatedly explained* to [the probationer] the risk he was running. . . . [T]he probation officer told [the probationer] . . . that [the psychiatrist] believed inpatient treatment was essential to meet the goal of 'proper psychiatric treatment' and exhorted [the probationer] to comply. Such a conversa-

tion may be considered as a component of the notification process. . . . Furthermore, the district judge . . . urged [the probationer] *on more than one occasion* to relent and told him in *no uncertain terms* that, if his intransigence did not abate, he would be found in violation of the probation order." (Citations omitted; emphasis added.) Id., 13.

Similarly, in *Mace* v. *Amestoy*, 765 F. Sup. 847 (D. Vt. 1991), the court found no violation of the probationer's right to fair notice of probation conditions because "[t]he probation officer, *as well as the therapist*, put [the probationer] on actual notice that his failure to admit the sexual intercourse was interfering with the successful completion of the treatment program. In other words, [the probationer] was given fair notice that his refusal to admit the full extent of his sexual conduct would be a violation of the probation conditions." (Emphasis added.) Id., 849–50.

Courts recognize, therefore, that a defendant may receive notice and fair warning sufficient to comport with due process without necessarily receiving that notice from a court. Indeed, probation officers can provide adequate fair warning.[19] Courts universally require, however, some set of circumstances, be it in a courtroom or in a meeting with a probation officer, a prohibition or common sense inference of a prohibition drawn from the situation, that creates an understanding and appreciation that engaging in certain conduct may result in a termination of conditional liberty.

The state argues that the simple knowledge that the defendant was to remain in sex offender treatment as a condition of probation satisfies the requisite prior fair

[19] General Statutes § 53a-30 (b) specifically allows the office of adult probation to require the defendant to comply with any conditions a court could have imposed so long as this condition is not inconsistent with any condition actually imposed by the court.

warning that speaking to group members outside of sessions about subpoenas would result in a revocation of probation. We disagree.

The defendant's contract with special services established several conditions for the defendant to follow. No condition covered the precise behavior alleged to have caused his discharge from sex offender treatment.[20] He agreed to attend treatment sessions on time, to participate fully in treatment sessions and to refrain from attending any session under the influence of drugs or alcohol, from committing a criminal offense, from making contact with the victim, from having any unsupervised contact with minors and from having any supervisory role in a "direct line of contact with minors under seventeen." Arguably, the only condition remotely connected to telling others in the program, away from the sessions, about his proposed lawsuit and the need for subpoenas is the agreement with special services to participate fully in the sessions.

Thus, the issue is whether the defendant had fair notice that the act of telling group members outside of group sessions that he would use his notes of sessions and would subpoena the members in connection with a lawsuit would violate the condition of fully participating in group therapy sessions conducted by special services. If he had been discharged from the program for failure to attend the sessions or for any of the listed reasons, a condition of his probation would be implicated. The question is, however, whether the defendant had prior notice that his behavior violated a condition of probation when the condition was not specifically listed as a condition nor reasonably included in the condition to obtain sex offender treatment. In revoca-

[20] One condition bound him to "comply with agency expectations regarding capacity to pay for services." As noted previously, however, the court specifically excluded from its finding a violation of this condition.

tion hearings where the alleged violative behavior is noncriminal, we hold that where the specific condition did not explicitly proscribe the defendant's conduct and could not be reasonably interpreted to proscribe the defendant's conduct, the defendant must receive actual notice that the continuation of the conduct could result in a charge of a violation of a condition of probation.

The transcripts of the violation of probation hearing reveal several conversations between the defendant and Kuziak regarding his note-taking and outside discussions with group members. None of those conversations, however, adequately put the defendant on notice that his behavior could result in revocation. Kuziak never responded directly to the defendant. Instead, she met and spoke with Hughes, Lynn Anderson, Hughes' cotherapist, and Patrick Little, also a special services therapist. Unlike the probationer in *Mace*, Kuziak never suggested to the defendant that the conditions of his probation proscribed his behavior and that to continue it could lead to revocation.[21]

The defendant did not receive fair warning from Hughes, either. Hughes testified that he spoke with the defendant in late May about the distance note-taking could put between him and the other members during therapy sessions. Hughes did not testify that he fully explained the ramifications of disregarding the directive to cease taking notes. Indeed, Hughes testified that it was of little moment, in his opinion, that the defendant took notes during sessions. If Hughes viewed this

---

[21] During the violation of probation hearing, the state asked Kuziak how she responded when the defendant disclosed his desire to transcribe his notes and subpoena witnesses. The following colloquy took place:

"Q. Did you make any comment relative to those comments he made to you?

"A. Not at that point.

"Q. Why not?

"A. I wanted to discuss it with Lynn Anderson and Jim Hughes."

behavior as minor, it is unlikely he expressed to the defendant that ignoring the request would result in a violation.[22] Furthermore, the defendant's note-taking was not a condition of probation that he was charged with violating. Hughes did not testify that he ever spoke to the defendant about conversations outside of group therapy. Kuziak informed Hughes only of the defendant's July 1, 1998 threats to subpoena members and to transcribe his notes. Hughes and special services made the decision to discharge the defendant the following day after learning of those threats. There could not have been fair warning to the defendant that the behavior alleged to be a violation of a condition could result in a termination of probation because the discharge occurred immediately after special services learned of the defendant's discussions outside therapy sessions.

The state does not direct us to testimony from any witness that contradicts the defendant's claim that no one made him fully aware of the ramifications of speaking with other group members. There were no comprehensive explanations, let alone repeated explanations. There was no urging from a court. There was no therapist who put the defendant on actual notice that his behavior compromised the sex offender treatment and, more importantly, that it threatened his continued conditional freedom. Kuziak knew the counselors were upset with the defendant's conduct, knew that his behavior was problematic, but never voiced any of those concerns to the defendant. Due process requires more than silence and ambivalence.

---

[22] It is not even clear that Hughes himself understood the ramifications of the defendant's discharge. At the violation of probation hearing, Hughes was asked about the discharge:

"Q. But as being discharged from special services he violates his probation, is that not correct?

"A. I have no idea, that's up to his probation officer."

The state cites *State* v. *Welch*, 40 Conn. App. 395, 671 A.2d 379, cert. denied, 236 Conn. 918, 673 A.2d 1145 (1996), for the proposition that the defendant was fully aware of the need to conform his conduct to special services' requirements or face termination. We find this claim unconvincing. First, we note that *Welch* did not involve a due process notice challenge, but rather an insufficiency of the evidence claim. Even if the question had been a due process claim, the notice would likely have been found sufficient because the condition violated, no unsupervised contact with children, was specifically set out in the sex offender treatment program's form contract. Although the condition of probation as established by the sentencing court in *Welch* was the same as in the present case, namely a requirement that the defendant obtain sex offender treatment, the cases are otherwise dissimilar. We find it significant that one of the counselors in *Welch* informed the defendant that to remain in the program, he would have to honor the contract he had signed proscribing any unsupervised contact with children. Id., 397.

The defendant here did not refuse treatment.[23] Special services refused to treat him. The defendant's circular box was that there could be an automatic violation of the condition of probation that he obtain sex offender treatment if special services discharged him from treatment for any reason not specifically listed in their contract. A gamut of behavior or conduct prohibited but not listed might include the wearing of inappropriate clothing to meetings, the display of tattoos, the piercing of one's face or body, a particular facial hair or hair style, or hair coloring, on the ground that they are distracting and inimical to treatment. See id., 400 n.4. Because the defendant had no fair notice of the condition with which he was charged as having violated and

---

[23] In fact, on June 11, 1998, the defendant requested a transfer to the Middletown sex offender group from the New Haven sex offender group.

the existing conditions could not reasonably be interpreted to include the condition with which he was charged as having violated, it was invalid as a condition.[24]

The judgment finding the defendant guilty of a violation of probation is reversed and the case is remanded with direction to render judgment in favor of the defendant.

In this opinion the other judges concurred.

[24] We need not reach the question of whether, had the defendant received fair notice, the behavior found to have occurred could be a valid condition of probation on the basis of free speech considerations.

