# STATE OF CONNECTICUT *v.* MATTHEW BOSEMAN
## (AC 24061)

Lavery, C. J., and Flynn and West, Js.

Argued October 27—officially released December 17, 2004[1]

[1] December 17, 2004, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Eric D. Coleman*, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Adam B. Scott*, assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Matthew Boseman, appeals from the judgment of the trial court finding him in violation of the conditions of and revoking his probation pursuant to General Statutes § 53a-32. On appeal, the defendant claims that (1) he was denied due process of law because he lacked notice sufficient to warn him that the conditions of his probation proscribed the specific conduct alleged to have placed him in violation, (2) there was insufficient evidence to support the court's finding that he violated the conditions of his probation, and the court, consequently, abused its discretion in making that finding, (3) the court imposed an illegal sentence and (4) if his conduct constituted a violation of the conditions of his probation, then the conditions improperly interfere with his constitutional right to visitation and contact with his child. We agree with the defendant's first and third claims and reverse the judgment of the trial court. In light of our conclusion that the defendant was denied due process, we analyze only that dispositive claim.

The following facts are relevant to our resolution of this appeal. The defendant and his former girlfriend,

Ronnie Booker, are parents of a child. On September 26, 2000, the court issued a standing criminal restraining order against the defendant in favor of Booker. The court ordered that the defendant refrain from restraining, threatening, harassing, assaulting, molesting, sexually assaulting or attacking Booker. Additionally, the court ordered that the defendant refrain from entering Booker's home and refrain from having any contact with her. The court further ordered that all visitation with the child be pursuant to a court ruling.

The defendant's current troubles began when Booker, who was not then under a restraining order herself, sent him a birthday card. In response, the defendant, in violation of the no contact portion of the standing criminal restraining order against him, sent Booker a card and letter on her birthday in which he generally expressed remorse for his responsibility in the deterioration of their relationship and indicated his desire to put the interests of their child first. On April 18, 2001, for this transgression of the standing order, the defendant pleaded guilty to violating the criminal restraining order, and the court, *Smith, J.*, sentenced him to four years incarceration, execution suspended after nine months, and three years of probation. The conditions of the defendant's probation included the standard conditions preprinted on the form JD-AP-110 and three court-ordered special conditions: No contact with Booker, obey the criminal restraining order and mental health counseling as appropriate.

After being released from prison, the defendant sought an order for visitation from the Superior Court, and he and Booker, with the assistance of a family relations officer, came to a written agreement concerning visitation with their child. The agreement, which the court approved on August 21, 2002, provided: "Parties agree that father will have contact with [the child] . . . every other weekend on Saturday and Sunday from

2:00-7:00 p.m. Additionally, father will have contact with [the child] every Thursday evening from 4:30 to 7:30 p.m. Father will arrange transfer of [the child] with Craig Stallings, mother's boyfriend. If for any reason father is unable to keep the above schedule, his girlfriend, Lisa Boucher, will contact mother directly. Parties agree to return to court on November 20, 2002 to review the above and expand the contact schedule as appropriate." Stallings was to facilitate all drop off and pickup of the child.

On August 29, 2002, the defendant was to have his first visitation with his child since the court approved the visitation agreement. Because the defendant had to work that evening, he discussed with Stallings a change in the pickup and drop off times. Booker then telephoned the defendant directly to discuss a revised pickup time of 11:30 a.m. at the Verplanck Middle School. Although there was a criminal restraining order prohibiting the defendant from *any contact* with Booker, Booker testified that the order did not apply to her contacting the defendant. It appears that although she knew that he was restrained from contact with her, she frequently telephoned him, although he refrained from telephoning her directly and made all contacts through Stallings. During the conversation concerning the new pickup time, Booker also told the defendant that their child had broken his lunch box. Booker testified that she informed the defendant about the broken lunch box and that the child might ask the defendant to purchase a new one. The defendant testified, however, that Booker specifically asked him to purchase a new lunch box. Stallings testified that he also explained to the defendant that the child wanted a lunch box.

The defendant met Stallings at the school, where he picked up his child at 11:30 a.m. The defendant testified that he and Stallings did not discuss a drop off location.

As the drop off time of 2 p.m. approached, the defendant attempted to contact Boucher to request that she telephone Stallings to confirm that he was to drop off the child at Booker's home, but he was not able to get through to Boucher at work. Additionally, he testified that although Boucher had Stallings' telephone number, he did not have the number. When the defendant could not get through to Boucher, he took his child to Booker's home, where he assumed that Stallings would be waiting for him. He also testified that he was running a little late. Stallings, in fact, was present at Booker's home when the defendant and the child arrived. Booker was not present, however, because she was working her normal 7:30 a.m. until 3:30 p.m. shift at Hartford Hospital.

In contrast to the defendant's testimony, Stallings testified that the defendant was supposed to drop off the child to him at Manchester Community College at 2 p.m. Additionally, Stallings testified that he did go to the college to meet the defendant and that he waited fifteen minutes, but the defendant failed to arrive. After waiting fifteen minutes for the defendant, he returned to Booker's home. When asked by the defense attorney whether there was a contingency plan in the event that the defendant was running late, however, Stallings responded: "There was no contingency plan other than to call me. We usually . . . . Let me think . . . . Back then that was the first—Thursday was the first meeting that we had. It was the first visitation date. So, there was no contingency plan to meet at an alternative site or anything like that. I would simply just wait at [the college] until he showed up, basically. There was no contingency plan." Stallings stated that it was approximately 2:45 p.m. when the defendant finally returned the child to Booker's home, and the defendant informed him that he had not yet purchased the lunch box, but that he would go to a store and bring it to the house

later. Prior to his sentencing, however, the defendant submitted his time record from work. This record showed that the defendant arrived at work on August 29, 2002, at 2:18 p.m.

On Friday, August 30, 2002, the defendant went to Booker's home to drop off the new lunch box, under the assumption that Booker would be at work, but Stallings would be at the residence. He went to the porch, put down the lunch box, rang the doorbell and then walked to his car. Stallings' testimony regarding this incident was as follows: "I just came home . . . from picking [the child] up from school. We went to put our lunch down on the table, the doorbell rang, and I heard a little commotion or something like that as I was going to answer the door. When I opened the door, [the defendant] was getting in the car and driving off and there was a lunch box at my feet." The defendant testified that he did not see Booker when he dropped off the lunch box. Conversely, Booker testified that she had stayed home that day because she was sick, that she saw the defendant from her bedroom window, yelled at him as he walked back to his car and that he yelled back at her.[2] She further testified, however, that the

[2] Booker contacted the police and asked that the defendant be charged with a violation of the criminal restraining order. She filed two different statements with the Manchester police department on August 30, 2002. One of the statements, which is contained in the appendix to the defendant's brief and which seems contrary to her court testimony, was as follows: "I am giving this statement to [Officer David] Patria and the Manchester police of my own free will, without fear or promise. I have a protective order against [the defendant]. He has visitation of his son who lives here with me. On 8/29/02, [the defendant] came to this residence and dropped off our son. [The defendant] does not have the right to do this. He is to have visitation and to pick up our son at [Manchester Community College]. He is also to drop off our son at [Manchester Community College], not this address. He was to drop off our son around 1:30 p.m. [The defendant] showed up at the [Manchester Community College] drop off at 2:15 p.m., he was 45 minutes late. I had given him the benefit of the doubt due to the inclement weather. I was present to receive my child. This location for the drop off is acceptable to both of us. It should be noted that [the defendant] told my boyfriend, Craig, that I had given him permission to return our son

defendant did not restrain, assault, threaten, harass or molest her, nor did he attempt to gain entry into her home on either August 29 or August 30, 2002.

On October 2, 2002, the defendant's probation officer, Heather Cato, requested that a warrant be issued for the defendant's arrest on the ground that he was in violation of the conditions of his probation, specifically, the conditions that he not violate any criminal law, that he have no contact with Booker and that he obey the criminal restraining order. After a March 5, 2003 violation of probation hearing, the court found that the defendant had violated the conditions of his probation by going to Booker's home. More precisely, it found that the state had proven, by a fair preponderance of the evidence, that the defendant wilfully and intentionally violated the special condition of his probation not to have any contact with Booker. Although the defendant already had served nine months of the original four year sentence that had been imposed, the court revoked the defendant's probation and sentenced him to four years incarceration, execution suspended after twelve months, and forty-eight months of probation.[3] After rendering judgment, the court granted the defendant's

to this address. I did not give him permission, and Craig believed it was legitimate. I wish to have him arrested for a violation of the order."

The other statement, which the defendant submitted as exhibit B at the violation of probation hearing, was as follows: "I am giving this statement to [Officer] Patria and the Manchester police of my own free will. When the doorbell rang, I looked outside from the upstairs window and saw [the defendant] standing on my stoop. It was around 11:00 a.m. He is not to be here. I have an active family violence protective order against him. I spoke to him from the upstairs window and told him that he was not supposed to be at this address. [The defendant] threw up his arms and left in his vehicle. He left a small [lunch box] on the stoop for my son. I wish to have charges pressed against [the defendant]."

[3] Although we conclude that there is no need to analyze the defendant's claim that this sentence was illegal, we do recognize its illegality as a matter of law because the court could not enlarge the sentence, but was limited to sentencing the defendant to all, some or none of the unexecuted portion of it.

request that an appeal bond be set and further ordered, as a condition of bond, that the defendant not enter Booker's home or go onto her property and that he not come within 100 yards of her residence. This appeal followed.

Although the state and the defendant do not agree on all of the facts, they do agree that the defendant twice went to Booker's home, first to drop off the child to Stallings and then, again, to deliver a new lunch box. Where the parties diverge, however, is on the question of whether the conditions of the defendant's probation proscribed those activities and, if so, whether the defendant had notice of those proscriptions. The first question for us to resolve, therefore, is not whether the defendant engaged in specific conduct, but whether his conduct could constitute a violation of a valid condition of probation on the facts of this case. See *State* v. *Reilly*, 60 Conn. App. 716, 727, 760 A.2d 1001 (2000).

The defendant argues that as a matter of law, he lacked notice that his behavior could be interpreted as a violation of the specific condition of probation that he not have any contact with Booker. The claim that the defendant lacked sufficient notice concerning this condition presents a question of law over which our review is plenary. See id., 727. "[T]he interpretation of a probation condition and whether it affords a probationer fair warning of the conduct proscribed thereby are essentially matters of law and, therefore, give rise to de novo review on appeal." (Internal quotation marks omitted.) Id., quoting *United States* v. *Gallo*, 20 F.3d 7, 11 (1st Cir. 1994). We are called on to interpret the specific condition that the defendant not have any contact with Booker to determine whether this condition prohibited the defendant from going to Booker's house when he believed that Booker would be at work.

We first consider whether the defendant received fair and sufficient warning that his behavior would consti-

tute a violation of probation. "Due process requires, at a minimum, that an individual receive notice of probation conditions and an opportunity to be heard. . . . The purpose of notice of conditions is to ensure that the probationer understands the precise terms of his obligations and that he risks termination of his probation if he fails to meet those obligations.

"Written conditions of probation formally imposed by a court order usually provide notice sufficient to satisfy due process. Therefore, where there is an alleged violation of an explicit condition, it would be difficult for a defendant to claim successfully that he was denied due process on the ground of no fair notice. Obviously, a finding of actual notice impliedly includes a finding of fair notice.

"Where criminal activity forms the basis for the revocation of probation, the law imputes to the probationer the knowledge that further criminal transgressions will result in a condition violation and the due process notice requirement is similarly met. An inherent condition of any probation is that the probationer not commit further violations of the criminal law while on probation. . . .

"Where noncriminal activity forms the basis for the revocation of probation, due process requires specific knowledge that the behavior involved is proscribed. [W]here the proscribed acts are not criminal, due process mandates that the [probationer] cannot be subject[ed] to a forfeiture of his liberty for those acts unless he is given prior fair warning." (Citation omitted; internal quotation marks omitted.) *State* v. *Reilly*, supra, 60 Conn. App. 728–29.

These principles guide us in considering whether the defendant violated any condition of his probation. We conclude that no court imposed or written condition of the defendant's probation specifically prohibited him

from going to, but not attempting to enter, Booker's home. The criminal restraining order did not limit the defendant from going to Booker's house to have contact with Stallings, the court-appointed intermediary in visitation matters, or with the defendant's child, although it specifically did prohibit him from entering the home or from having any contact with Booker.[4] The court imposed condition that the defendant not have any contact with Booker likewise did not limit him from contact with Stallings or the defendant's child at or near Booker's home.

Despite our conclusion that the court-ordered conditions of probation did not specifically prohibit the defendant from going to Booker's home, we must also determine whether the defendant had prior knowledge from the probation officer's comments that she was adding to his conditions of probation a new condition prohibiting him from going to Booker's home, even when he reasonably believed that Booker was at work and not present at the home. Unless he received prior fair warning that his acts could result in revocation of probation, the court's revocation violated the defendant's right to due process. See id., 730. Here, the court specifically found that the defendant violated the no contact condition of his probation merely by going to Booker's home on August 29 and 30, 2002.

In *United States* v. *Gallo*, supra, 20 F.3d 13, the United States Court of Appeals for the First Circuit found it significant that the defendant's probation officer and the court repeatedly explained to the defendant that, because of his actions, he was running a risk of violating the conditions of his probation. In finding that the defendant had fair warning that his actions would violate the conditions of his probation, that court held that the

---

[4] There was no evidence, nor an allegation, that the defendant attempted to enter the home or tried to contact Booker.

*repeated warnings of the court and the probation offi-
cer* "may be considered as a component of the notifica-
tion process. . . . Furthermore, the district judge . . .
urged [the probationer] on more than one occasion to
relent and told him in no uncertain terms that, if his
intransigence did not abate, he would be found in viola-
tion of the probation order." (Citations omitted.) Id., 13.

As we explained in *Reilly*, "[c]ourts recognize . . .
that a defendant may receive notice and fair warning
sufficient to comport with due process without neces-
sarily receiving that notice from a court. Indeed, proba-
tion officers can provide adequate fair warning." *State*
v. *Reilly*, supra, 60 Conn. App. 731. "General Statutes
§ 53a-30 (b) specifically allows the office of adult proba-
tion to require the defendant to comply with any condi-
tions a court could have imposed so long as this
condition is not inconsistent with any condition actually
imposed by the court." *State* v. *Reilly*, supra, 731 n.19.
"Courts universally require, however, some set of cir-
cumstances, be it in a courtroom or in a meeting with
a probation officer, a prohibition or common sense
inference of a prohibition drawn from the situation,
that creates an understanding and appreciation that
engaging in certain conduct may result in a termination
of conditional liberty." Id., 731.

The state argues that the testimony of the defendant's
probation officer, Cato, establishes that the defendant
had adequate fair warning that his actions would violate
the conditions of his probation because Cato had
informed him that he would be in violation merely by
going to Booker's home. We disagree.

Cato testified that she explained the conditions of
probation to the defendant and that she instructed him
that he could not go to Booker's home, telephone her
or be on her street. The defendant was not presented
with a revised conditions of probation form that prohib-

ited him from going onto Booker's property or her street, however, and he testified that Cato did not explicitly inform him that if he went to the outside of Booker's home, he would be in violation of the conditions of his probation. According to the defendant, Cato informed him only that she would not recommend that he go to Booker's house.

The question comes down to whether the defendant had prior notice that going to the outside of Booker's house to drop off his child to the court-appointed visitation intermediary and to deposit a requested lunch box on the front porch could have been contemplated reasonably by the no contact condition. "In determining whether the no contact provision provided definite notice of prohibited conduct, we consider whether a person of ordinary intelligence would reasonably know what acts are permitted or prohibited by the use of his common sense and ordinary understanding." (Internal quotation marks omitted.) *State* v. *Calderon*, 82 Conn. App. 315, 331, 844 A.2d 866, cert. denied, 270 Conn. 905, 853 A.2d 523, cert. denied, 543 U.S. 982, 125 S. Ct. 487, 160 L. Ed. 2d 361 (2004). The defendant's conditions of probation form specifically prohibited him from contacting Booker and from violating the criminal restraining order. Nowhere, in either the criminal restraining order or the conditions of probation form, was the defendant specifically prohibited from going to the outside of Booker's home. Neither condition covered the precise behavior alleged to have caused the violation of the conditions of his probation. The defendant did not attempt to enter the home, to have contact with Booker or to harass, to assault or to threaten her. He went to the home specifically to drop off his child to Stallings and to deliver a new lunch box for his child to replace the one that Booker told him had broken. Accordingly, we conclude that this behavior was not

listed specifically or reasonably contemplated by the no contact condition of the defendant's probation.

"In revocation hearings where the alleged violative behavior is noncriminal, we hold that where the specific condition did not explicitly proscribe the defendant's conduct and could not be reasonably interpreted to proscribe the defendant's conduct, the defendant must receive actual notice that the continuation of the conduct could result in a charge of a violation of a condition of probation." *State* v. *Reilly*, supra, 60 Conn. App. 732–33.

In this case, Cato testified that the defendant posed several hypothetical situations to her, asking what would be allowed and what would not be allowed under his conditions of probation, including questioning her as to whether he could go onto Booker's street. Cato verbally instructed the defendant that he could not contact Booker, go to her home, telephone her or be on her street. When the court, *Swords, J.*, specifically asked Cato why she informed the defendant that he could not be on Booker's street, she responded that she thought that was consistent with the conditions that the court had ordered.

The defense attorney asked Cato: "When you responded to [the defendant's] question concerning could he be on the street that Ms. Booker lived on, did he elaborate any further . . . concerning what he was intending to do?" Cato responded: "No, he didn't elaborate." The defense attorney then asked Cato: "If [the defendant] had a friend or relative that lived on the same street . . . and [he] was actually asking whether or not it would be all right for him to visit that person, would your advice to him be the same?" Cato responded: "No." The defense attorney additionally questioned Cato as to whether she discussed certain hypothetical situations with the defendant such as what

he should do if he inadvertently encountered Booker, and Cato responded that she could not recall having any such discussions with the defendant. The court concluded that Cato had informed and ordered the defendant not to go to Booker's home and not to go onto her street and that, when the defendant did so, he wilfully and intentionally violated the no contact condition of his probation.

This leads us to the final question presented, which is whether, as a matter of law, the defendant received actual, fair and sufficient notice that his conduct could result in a violation of the no contact condition of his probation. As the United States Court of Appeals for the Second Circuit explained in *United States* v. *Barth*, 899 F.2d 199, 203 (2d Cir. 1990), cert. denied, 498 U.S. 1083, 111 S. Ct. 953, 112 L. Ed. 2d 1042 (1991), a concern is raised when a "probation officer orally modifie[s] the conditions of probation without committing that modification to writing [because] . . . such conduct invites litigation over what the actual terms of probation [are]. Given that the penalty for violating a condition of probation can be a jail sentence, this is an area about which there should be as little uncertainty as possible. The better practice would be to write down the oral modification, thus diminishing the likelihood of later court battles and swearing matches between probationers and probation officers. This need not be an elaborate document; a simple letter outlining the modification would suffice."

In this case, in which the specific condition the court found the defendant to have violated could not be interpreted reasonably to prohibit his behavior, and Cato did not provide a written modification of that condition or a new condition, we conclude that the defendant was not afforded actual, fair and sufficient notice. Under the circumstances, he could not have known that his conditions of probation included a blanket prohibition against going to the outside of Booker's home. "It is of

the first importance that the people should know to what law they are subject." (Internal quotation marks omitted.) *Caldwell* v. *Meskill*, 164 Conn. 299, 313, 320 A.2d 788 (1973), quoting *State* v. *South Norwalk*, 77 Conn. 257, 261, 58 A. 759 (1904). Had Cato provided the defendant with a written provision prohibiting him from going within 100 yards of Booker's residence, as the court did in granting the defendant's appeal bond, or some firm prohibition against going to Booker's residence, we certainly would conclude that such a condition comported with the requirements of due process. Here, however, we have no written condition that reasonably could be interpreted to include such a blanket prohibition. Furthermore, despite Cato's testimony that she specifically instructed the defendant that he could not go to Booker's street, she also testified that she would not have advised the defendant that he was prohibited from going there if his purpose was to visit a friend or relative. With this in mind, we question how the defendant could have had adequate notice that he could not go to the outside of Booker's home to visit Stallings, to drop off his child and to deliver a requested lunch box. Indeed, it appears that even Cato did not think that a blanket prohibition of going onto Booker's street was consistent with the conditions of the defendant's probation.

Certainly, a probation officer can provide adequate, fair and sufficient warning of a condition of probation, but that warning was not present in this case. We conclude that the defendant did not have adequate, fair and sufficient warning that merely going to the front of Booker's home was a violation of the conditions of his probation.

The judgment is reversed and the case is remanded with direction to render judgment in favor of the defendant.

In this opinion the other judges concurred.